## IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
(HEARD AT JOHNSON CITY)

**FILED**

**February 23, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | **FOR PUBLICATION** |
| | ) | |
| Appellee, | ) | **Filed: February 23, 1998** |
| | ) | |
| v. | ) | KNOX COUNTY |
| | ) | |
| GREGORY JAY HOXIE, | ) | Hon. Richard R. Baumgartner, |
| | ) | Judge |
| | ) | |
| Appellant. | ) | |
| | ) | |
| | ) | No. 03S01-9706-CR-00061 |
| | ) | |

For Appellant:

Mark Stephens
Public Defender
Knoxville, Tennessee

Paula R. Voss
Assistant Public Defender
Knoxville, Tennessee
(Appeal Only)

Timothy M. McLaughlin
AND
John Halstead
Assistant Public Defenders
Knoxville, Tennessee

For Appellee:

John Knox Walkup
Attorney General & Reporter
Nashville, Tennessee

Michael E. Moore
Solicitor General
Nashville, Tennessee

Daryl J. Brand
Assistant Attorney General
Nashville, Tennessee

Randall Nichols
District Attorney General
Knoxville, Tennessee

Marsha Selecman
Assistant District Attorney General
Knoxville, Tennessee

## O P I N I O N

AFFIRMED.                                                    DROWOTA, J.

The Knox County Grand Jury returned an indictment charging the defendant, Gregory Jay Hoxie, with one count of felony stalking, one count of misdemeanor stalking,[1] and two counts of misdemeanor telephone harassment.[2] Count one, felony stalking, alleged that the defendant had stalked the victim, Suzette Hoxie, from June through October, 1994, in violation of an order of protection. Count two, misdemeanor stalking, alleged that the defendant had stalked the victim from January to June, 1994. Count three alleged that the defendant had harassed the victim by making threatening telephone calls. Count four charged that the defendant had harassed the victim by placing telephone calls "in an offensively repetitious manner and without a legitimate purpose of communication." The State introduced evidence of numerous incidents in support of its prosecution of felony and misdemeanor stalking. At the close of the proof, the jury returned a verdict of guilty on count one, felony stalking, count two, misdemeanor stalking, and count four, "offensively repetitious" telephone harassment. The jury found the defendant not guilty of count three, harassment by telephone threat.

In the Court of Criminal Appeals, the defendant argued that the State should have been required to make an election among the numerous incidents of stalking at the close of its proof-in-chief. According to the defendant, the trial court's failure to require such an election has resulted in a violation of his state constitutional right to a unanimous jury verdict. The Court of Criminal Appeals disagreed and held that no election was required because the offense of stalking

---

[1]Tenn. Code Ann. § 39-17-315 (1994 Supp.).

[2]Tenn. Code Ann. § 39-17-308 (1997 Repl.).

is defined as a continuing course of conduct. Thereafter, we granted the defendant permission to appeal and now affirm the judgment of the Court of Criminal Appeals.[3]

## BACKGROUND

The evidence presented at trial established that the defendant, Gregory Jay Hoxie, and the victim, Suzette Hoxie, separated in 1993 after eight years of marriage. The victim, along with her twelve-year-old daughter, and the couple's six-year-old daughter continued to reside in the family home on Langston Drive in the Halls community of Knox County. Sometime near the end of 1993, the victim filed a divorce action. The incidents resulting in this criminal prosecution began after the divorce action was instituted in January of 1994.

According to the victim's testimony at trial, the defendant would come by her school, or her house, or call her every day in January and February of 1994. The victim was a student at the Tennessee Technology Center in Knoxville with the goal of becoming a licensed practical nurse. Some days, the defendant would telephone the victim as many as forty times. One particular day in June of 1994, she received over eighty telephone calls from the defendant. During this period of time, the victim changed her telephone number six times.

On some occasions, the defendant would physically assault the victim. For

---

[3]Oral arguments were heard in this case on November 20, 1997 in Johnson City as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

example, in March the victim agreed to rent[4] a portion of her five car garage to the defendant so long as he limited his hours there to between 7:30 a.m. and 3:30 p.m. when she was away from home at school. On March 16th, the victim arrived home early from school and asked the defendant to leave. He refused and insisted upon working on her car. When she protested, he grabbed her purse, pulled her hair, strangled her, picked her up and threw her to the ground. The victim left, but returned at 3:30 p.m. The defendant was still there and threatened the victim. The victim called the police and had him arrested.

Another such incident occurred on April 20th, when the victim arrived home early from school and asked the defendant to leave her garage. When she was proceeding down the driveway, the defendant jumped on the hood of her car, leaned into her window, and screamed that "[she was] not going to get one red cent; that he was going to kill [her], because it would be a hell of a lot cheaper than what [she] was putting him through."

On April 8th, 22nd, and 25th, the defendant appeared at the victim's school. He questioned her about her activities and her companions. The victim described the defendant as "possessed." When he continued to come by the school, the victim called the police to the school and filed a police report on April 25th.

On May 21st, approximately one week after their divorce had become final,

---

[4]The victim testified that the defendant never paid the agreed upon rental price.

the defendant again appeared at the victim's garage even though he had been ordered by the divorce court to remove his belongings from her residence and leave. The defendant was attempting to give the couple's six-year-old daughter an opossum as a gift. When the victim refused to accept the animal and started to leave in her car, the defendant threw the metal cage for the animal at the victim's car.

On the night of May 22nd, the defendant appeared nude in the victim's driveway around 9:00 p.m. The victim was very upset by the incident, partly because both her daughters had seen the defendant. She called the police, who arrived and escorted the defendant from the property.

On May 29th, the victim and her daughters accompanied some friends to the lake. When they returned, the defendant was waiting at the victim's house and questioned her about her activities that day. When the victim refused to answer his questions, the defendant threw a wet towel in her face and used profanity towards the victim and her daughters. The victim and the children ran inside the house and locked the doors. The defendant beat on the metal doors until they were dented, and he threatened to kill the victim and the girls. When the victim attempted to call the police, the telephone was not working. Eventually, the victim's twelve-year-old daughter sneaked out the back of the house and ran to a neighbor's house and called 911. When the police arrived, they discovered that the victim's phone box had been removed and wires disconnected. After this incident, the victim and her daughters stayed at a neighbor's house, behind locked doors for a week.

On May 23rd, the victim petitioned the Circuit Court for a "no contact"[5] order of protection, and on June 2nd, the court granted the request and entered the order of protection. On June 4th, the victim and her daughters again went to the lake with the Fair family. On their return trip, the defendant drove alongside their car yelling and screaming at the victim. Sharron Fair described the victim as very frightened, and said that she had never been so afraid for anyone in her life.

On June 6th, the defendant called the victim's house and warned the victim's male friend to stay away from her. The two men argued, and when the victim's friend left about an hour later, the tires on his car had been slashed. On June 10th, the defendant went to the Y.M.C.A. where the victim's daughters attended day care and asked the twelve-year-old daughter for a key to the victim's house. The defendant did not leave until forced to do so by the staff at the Y.M.C.A. Later that day, the defendant came to the community pool where the victim and her children were swimming. The victim left to avoid a confrontation. Since the defendant no longer resided in the subdivision, he had no right to use the private pool which was open only to residents of the neighborhood.

The next day, June 11th, the defendant telephoned the victim and told her he had been at her school the day before and had sat in a classroom next to hers, watching her. He then described the substance of the two-hour lecture she had attended.

---

[5]The victim testified that an order of protection allowing "social contact" for had been in effect since June of 1993. Social contact had been authorized to allow the defendant and the victim to arrange visitation for their minor daughter. However, this order does not appear in the record.

On June 12th, the defendant came three times to the neighborhood pool where the victim and her children were swimming. On the third occasion, the victim told the defendant she would call the police if he did not leave them alone. The defendant slammed his body into hers with great force and said that he would have her killed if she had him removed from the pool. That night, after midnight, the victim awoke and saw the defendant looking through the windows into her home.

The defendant returned to the day care center and again attempted to speak to the victim's daughters on June 13th. That evening, the defendant appeared at a children's function to which the victim had taken her daughters. The victim showed the protective order to the doorman, and he barred the defendant from entering. However, the defendant returned later and sent someone inside to find the victim. The victim called 911, but the defendant left before the police arrived.

On June 24th, the defendant followed the victim to a restaurant where the victim had gone for the evening. She called 911 more than once that evening but it did not deter him. Later that night, the defendant telephoned the victim and told her he was not going to return their daughter from weekend visitation.

On July 8th and 13th, the defendant went to the offices of the Private Industry Council, an agency which had provided some of the funding for the victim's educational training. He spoke with staff members there about the eligibility requirements for the program, and tried to convince the intake

coordinator for the agency that the victim had obtained funding illegally and through false pretenses. He told a case manager that the victim had "put him through three weeks of hell" and that "it was time for payback." He threatened to "get [the agency] torn down" if they did nothing about the victim's fraud. Staff at the agency described the defendant as loud, belligerent, and intimidating. The intake coordinator reviewed the victim's records and determined that, contrary to the defendant's assertions, she had been eligible for the program.

In July, the tires on the victim's car were deflated on eight different occasions, but a perpetrator was not identified. Throughout the summer months, the defendant left many cards and notes for the victim on her car, at the door of her home, or at the hospital where she was performing a clinical class as part of her school work. Generally, the cards expressed the defendant's love for the victim or said how much he wanted her to come back to him. The victim was upset by the cards and said she had never received a single card from the defendant during their eight years of marriage. In late July, 1994, the victim requested that the security personnel at the hospital pay special attention to her car. Thereafter, on July 27th and 28th, security personnel observed the defendant leave a note on the victim's car and pull into a parking spot next to the victim's car.

A classmate of the victim's also saw the defendant at the school and at the hospital on numerous occasions. She said the defendant would often arrive at lunch and follow the victim throughout the lunch break. This classmate had seen the defendant standing by the victim's car in the parking lot and also had observed him watching the victim from a classroom doorway at the school.

In September, the victim borrowed her neighbor's car to go on a date. The defendant discovered where the victim had gone, followed her to the restaurant and came inside. The victim quickly exited the restaurant through the kitchen. The defendant followed the victim all the way back to her house.

In October, the victim began working part-time as a bartender at the Cherokee Country Club. The defendant approached the assistant manager at the country club and demanded to know the victim's schedule.

Finally, on October 23rd an argument ensued when the defendant would not remove his truck from the victim's home. The defendant grabbed the victim by the throat and threw her against a wood pile. The victim's nose was bloodied, a large amount of her hair was pulled out, and she lost some earrings.

According to the testimony of a number of her friends, classmates, and acquaintances, the victim lived in constant fear of the defendant's threats and actions. She often missed school because of fear for herself and her classmates. At one point, the victim considered withdrawing from school, but was dissuaded by one of her instructors. Her neighbor, Sharon Fair, sheltered the victim and her daughters on more than one occasion. Fair said the defendant repeatedly and constantly telephoned her home when the victim was there and that the only relief from the phone calls was to put the phone off the receiver. Fair said the victim feared for her life and had asked Fair to raise her daughters if the defendant killed her.

Based upon this proof, the jury found the defendant guilty of felony stalking, in violation of an order of protection, from June through October, 1994, misdemeanor stalking, from January to June, 1994, and misdemeanor telephone harassment for placing telephone calls "in an offensively repetitious manner and without a legitimate purpose of communication." The Court of Criminal Appeals, in an opinion authored by Judge John H. Peay, and concurred in by Judge David G. Hayes and Judge William M. Barker, upheld the jury's verdict. For the reasons that follow, we affirm the judgment of the Court of Criminal Appeals.

## ELECTION REQUIREMENT

As related above, the State introduced evidence of numerous incidents in support of its prosecution of one count of felony stalking and one count of misdemeanor stalking. Relying upon Burlison v. State, 501 S.W.2d 801 (Tenn. 1973), and its progeny, the defendant asserts that the State should have been required to elect those particular incidents for which it was seeking convictions. In contrast, the State argues that the Court of Criminal Appeals correctly found that no election was required because to establish the offense of stalking the State must prove a continuous course of conduct.

We begin our analysis of this issue with Burlison, in which the defendant had been charged with one count of carnal knowledge of a female under the age of twelve years. Id., 501 S.W.2d at 802. The State introduced proof of numerous incidents of sexual fondling and intercourse during the relevant time period charged in the indictment. This Court held that under such circumstances, it is

"the duty of the trial judge to require the State, at the close of its proof-in-chief, to elect the particular offense of carnal knowledge upon which it would rely for conviction, and to properly instruct the jury so that the verdict of every juror would be united on the one offense." Id., 501 S.W.2d at 804. Three reasons for requiring election were enumerated by the Burlison decision: (1) to enable the defendant to prepare for and defend against the specific charge(s); (2) to protect the defendant from double-jeopardy by individualization of the issue; and (3) to ensure unanimity of verdict so that the jury's verdict may not be a matter of choice between offenses--some jurors convicting of one offense and others of another offense. Id., 501 S.W.2d at 803.

More recently, we discussed the election requirement in State v. Shelton, 851 S.W.2d 134 (Tenn. 1993). There, the defendant had been charged with the unlawful sexual penetration of one female and unlawful sexual contact with two other females. The State narrowed the time frame within which the offenses occurred prior to trial to between April 7 and September 6, 1989. However, testimony at trial indicated that numerous incidents of the unlawful conduct occurred during the time period specified by the indictment. Although, the State was not required to elect the offenses for which it sought convictions at the close of its proof-in-chief, the trial court gave the jury a general instruction regarding unanimity. This Court held the instruction to be an inadequate substitution for "Burlison's explicit requirement that the prosecution identify the specific offenses for which it seeks convictions." Id., 851 S.W.2d at 136. Emphasizing that "each unlawful act of carnal knowledge is a separate, substantive offense, rather than a continuous offense," the Shelton court held that "to avoid the prosecution of

-11-

uncharged crimes in cases involving age of consent laws and other sexual crimes, the State is required to elect the specific offense upon which a verdict of guilty would be demanded." Id., 851 S.W.2d at 137 (internal quotations omitted and emphasis added); see also Jamison v. State, 117 Tenn. 58, 94 S.W. 675 (1906).

While acknowledging the three justifications cited by Burlison for the election requirement, this Court stated that the third rationale "addresses the most serious concern: the well-established right under our state constitution to a unanimous jury verdict before a criminal conviction is imposed." Shelton, 851 S.W.2d at 137; see also Tidwell v. State, 922 S.W.2d 497, 501 (Tenn. 1996) (Expressing continued adherence to the Shelton rationale, particularly the recognition that ensuring unanimity is the most significant of the justifications for the election requirement).

This precedent clearly establishes that the State must make an election of offenses when it is pursuing convictions for discrete crimes and proof of additional discrete crimes has been introduced at trial. However, as was implicitly recognized in Shelton, the election requirement is not applicable when the crime charged requires the State to prove a continuous course of unlawful conduct. Indeed, in articulating the rule in Shelton, this Court was careful to point out that "each unlawful act of carnal knowledge is a separate, substantive offense, rather than a continuous offense." Shelton, 851 S.W.2d at 137 (emphasis added). Therefore, in resolving this appeal, we must examine the statutory elements of the crimes of stalking and harassment.

The defendant was charged with and convicted of felony and misdemeanor stalking in accordance with Tenn. Code Ann. § 39-17-315 (1994 Supp.),[6] which in pertinent part provides as follows:

(a)(1) A person commits the offense of stalking:

(A) Who repeatedly follows or harasses another person with the intent to place that person in reasonable fear of a sexual offense, bodily injury or death;

(B) Whose actions would cause a reasonable person to suffer substantial emotional distress; and

(C) Whose acts induce emotional distress to that person.

(2) As used in this subsection:

(A) "Follows" means maintaining a visual or physical proximity over a period of time to a specific person in such a manner as would cause a reasonable person to have a fear of a sexual offense, bodily injury or death;

(B) "Harasses" means a course of conduct directed at a specific person which would cause a reasonable person to fear a sexual offense, bodily injury, or death, including, but not limited to, verbal threats, written threats, vandalism, or unconsented-to physical contact; and

(C) "Repeatedly" means on two (2) or more separate occasions.

(b)(1) Stalking is a Class A misdemeanor.

. . .

(3) Any person who violates subsection (a) after having been enjoined or restrained by order, diversion, or probation agreement of a court of competent jurisdiction in effect prohibiting the behavior described in subsection (a) against the same party commits a Class E felony. . . .

---

[6]Subsection (b) of the statute was amended in 1995 to delete the provision elevating the offense of stalking to a felony when a court order of protection is in effect. The effective date of the amendment was July 1, 1995, and is not applicable in this appeal since the defendant was indicted in October of 1994.

Reviewing the statutory definition it is clear that the crime of stalking is not committed upon a single, discrete act by the defendant, unlike the sex offenses involved in Burlison and its progeny. Instead, the statute which defines stalking as a criminal offense contemplates a series of discrete actions amounting to a continuing course of conduct. To obtain a conviction for stalking, the State must prove beyond a reasonable doubt that the defendant engaged in the prohibited conduct "repeatedly," which is defined by the statute as "two (2) or more separate occasions." Likewise, the statute defines "follows" as "maintaining a visual or physical proximity over a period of time to a specific person." Finally, "harasses" is defined as a course of conduct directed at a specific person." By definition, therefore, the offense of stalking, requires proof of a continuous course of conduct.

Likewise, the offense of telephone harassment for which the defendant was convicted contemplates a continuing course of conduct. Tenn. Code Ann. § 39-17-308 (1997 Repl.) provides:

> (a) A person commits an offense who intentionally:
>
> **. . .**
>
> (2) Places one (1) or more telephone calls anonymously, or at an inconvenient hour, or in an offensively repetitious manner, or without a legitimate purpose of communication and by this action knowingly annoys or alarms the recipient.

The offense of harassment itself requires more than one telephone call or telephone calls in a repetitious manner. Again, like the offense of stalking, a continuous course of conduct is required and each telephone call does not itself

-14-

constitute the offense charged. Therefore, in this case, allowing proof of numerous incidents of telephone harassment and stalking did not compromise the defendant's constitutional right to a unanimous jury verdict because, only two stalking offenses and one offense of telephone harassment have been charged and proven. That the offenses involve numerous discrete parts does not put the defendant at risk of a non-unanimous jury verdict. While we agree with the Court of Criminal Appeals that the unlawful actions which constitute the offense of stalking may in some instances be separate distinct crimes, we conclude that when the only offense charged requires proof of a continuous course of conduct, the election requirement does not apply.

Under such circumstances, the other two concerns enunciated by the Burlison court in support of the election requirement may be satisfied, as in this case, by the form of the indictment and the nature of the proof. The charge of misdemeanor stalking encompassed the time period before a protective order was issued, January through June of 1994. The charge of felony stalking encompassed the time period following issuance of the protective order, June through October of 1994. The charge of harassment included the telephone calls from January through June 1994. These specific date limitations not only provided the defendant with notice of the general nature of the conduct with which he was charged, but also afforded him double jeopardy protection from future prosecution for stalking and harassment during this same time period. Consequently, no election was required since there was no danger of a nonunanimous verdict and the defendant was provided with notice and double jeopardy protection.

**CONCLUSION**

Having concluded that the trial court did not err by failing to require the State to make an election, we affirm the judgment of the Court of Criminal Appeals upholding the judgment of the trial court.

_____
FRANK F. DROWOTA, III,
JUSTICE

**Concur:**

Anderson, C.J.,
Reid, Birch, Holder, JJ.