William PECKINPAUGH,
Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 48A02–0005–CR–318.

Court of Appeals of Indiana.

March 13, 2001.

Joseph P. Hunter, Muncie, IN, Attorney for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Christopher L. Lafuse, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge

William Peckinpaugh appeals his conviction of Battery,[1] a class B misdemeanor, Criminal Confinement,[2] a class D felony, two counts of Stalking,[3] class C felonies, and Burglary,[4] a class B felony. Peckinpaugh presents the following restated issues for review:

1. Do the two convictions of stalking violate double jeopardy principles?
2. Did the trial court err in sentencing Peckinpaugh?

We affirm in part, reverse in part, and remand.

The facts favorable to the convictions are that Peckinpaugh and Judy Fillmore were involved in a romantic relationship and lived together for approximately two years. In January or February of 1999, Fillmore ended the relationship, and Peckinpaugh, who did not want the relationship to end, moved out a month or two later. In early August 1999, Fillmore returned home from a date with another man and discovered that Peckinpaugh had left a message on her answering machine. Within ten minutes after her date left, Peckinpaugh started "beating" on Fill-

---

1. Ind.Code Ann. § 35–42–2–1 (West.Supp. 2000).

2. IC § 35–42–3–3 (West 1998).

3. Ind.Code Ann. § 35–45–10–5 (West Supp. 2000).

4. Ind.Code Ann. § 35–43–2–1 (West Supp. 2000).

more's front door. *Record* at 351. Fillmore did not open the door, but instead moved to a nearby bathroom window and spoke to him through the window. Peckinpaugh threatened to "kill [Fillmore] and any S.O.B. that ever wanted to be with [her]." *Record* at 352. Thereafter, Fillmore sought a protective order. On September 8, the Madison County Court issued a protective order directing Peckinpaugh to "refrain from abusing, harassing, or disturbing the peace of the Petitioner by either direct or indirect contact," *Record* at 368, and to refrain from damaging her personal property and from entering onto the property where Fillmore's residence was located.

Late in the evening of December 5, 1999, Peckinpaugh broke into Fillmore's house. He cornered her in a bathroom and kept her there against her will through the early morning hours of December 6 while he attempted to persuade her to resume a relationship with him. According to Fillmore, Peckinpaugh screamed and yelled and was angry the whole time. Fillmore attempted to leave several times, but Peckinpaugh physically prevented her from exiting the bathroom. Eventually, when Peckinpaugh kneeled down for a moment, Fillmore jumped over him and fled from the bathroom. Peckinpaugh then left the house. Fillmore subsequently discovered that Peckinpaugh had taken the telephone receiver off of its hook in her garage in order to prevent her from placing a telephone call from inside her house.

On December 13, 1999, Peckinpaugh mailed a greeting card to Fillmore asking her to resume their relationship. On December 25, 1999, Peckinpaugh left a message for Fillmore on her answering machine.

On January 7, 2000, the Madison County Probation Department (the Probation Department) placed an electronic monitoring device on Peckinpaugh's ankle and a receiver in Fillmore's house. With those devices in place, the receiver would alert Fillmore if Peckinpaugh came within 300 feet of her house. Several weeks later, Peckinpaugh informed the Probation Department that he had an out-of-state job interview and, on February 8, 2000, police removed the monitor from Peckinpaugh's ankle. Officials informed Fillmore that Peckinpaugh was not wearing a monitor and advised her that she should consider staying somewhere other than her home until the monitor was put back in place. Heeding this advice, Fillmore went to stay at the house of a friend for several days. While alone at the friend's house on February 10, Fillmore opened the inner door to lock the storm door. When she did, she saw someone move furtively between two houses nearby. She shut the door, turned off a light, and looked outside in that direction. She saw Peckinpaugh standing beside the house next door to the one in which she was staying. When the friend returned home on February 12, he found a voice mail message on his answering machine. The message was from Peckinpaugh to Fillmore and stated, "Last night was a terrible mistake." *Record* at 620.

On December 16, 1999, the State filed a five-count indictment against Peckinpaugh, including the following: Count I, battery; Count II, criminal confinement; Count III, burglary; Count IV, stalking; and Count V, invasion of privacy. On February 16, 2000, the State added a sixth count, for stalking. Counts I—III alleged activities that occurred on the night of December 6, when Peckinpaugh broke into Fillmore's home. Counts IV and V alleged activities that occurred between the issuance of the original protective order, on September 8, 1999, and the break-in on December 6, 1999. Count VI alleged activities that occurred after December 6, 1999. Following a jury trial, Peckinpaugh was found guilty of all charges and convicted as set out above.

1.

 Peckinpaugh contends that his multiple convictions for stalking violate constitutional double jeopardy principles.

Specifically, Peckinpaugh notes that the offense of stalking contemplates a series of acts, and contends that double jeopardy principles prevent the State from dividing a larger series of acts into multiple smaller series for the purpose of obtaining multiple convictions. He contends that his actions from September 8, 1999 to February 16, 2000 constitute only one violation of IC § 35–45–10–5, not two.

The parties do not direct our attention to an Indiana case addressing this issue, nor does our research reveal one. We do, however, find a case decided by the Florida Court of Appeals that addressed substantially the same issue. In *State v. Jones*, 678 So.2d 1336 (Fla.Ct.App.1996), the defendant was charged with aggravated stalking for repeatedly following and harassing Carolyn Jones after an injunction had been issued forbidding any contact. The activities that formed the basis of the allegation occurred on April 30, 1995. Later, the same defendant was charged with another count of aggravated stalking, this time for events alleged to have occurred between May 1 and May 16, 1995. As in the former case, the victim in the latter case was Carolyn Jones. The defendant was tried and acquitted in the former case. Thereafter, the defendant moved to dismiss the second case upon the claim that aggravated stalking was a continuing crime and that the offenses charged should have been brought in a single prosecution. The trial court agreed and dismissed the second case, and the State appealed.

We reproduce below the Florida appellate court's rationale for reversing the trial court and reinstating the second stalking charge:

The issue here concerns that aspect of double jeopardy dealing with whether a particular factual circumstance constitutes one or two or more separate and distinct factual events. The defendant's position is that because aggravated stalking is in the nature of a continuing offense and he was charged with and acquitted of aggravated stalking in [the first case] he could not be charged with aggravated stalking in [the second case].

This argument ignores the fact that while aggravated stalking requires repeated acts, such acts could conceivably constitute separate and distinct factual events which would support multiple prosecutions and convictions. Thus, in a clear example, if an accused repeatedly follows or harasses the victim with the requisite intent he may be guilty of aggravated stalking. If, after prosecution for the offense, the accused again undertakes to follow or harass on a repeated basis the victim, again with the requisite intent, he has committed another aggravated stalking.

This case does not present post-prosecution conduct but rather post-arrest conduct of the defendant, *i.e.*, the defendant's alleged harassment of the victim after his arrest in connection with [the first case] by way of telephone calls and letters. The defendant's apprehension and arrest in this context concluded the factual event which formed the basis for the arrest and began a separate and distinct factual event.

*Id.* at 1338 (citations to authority omitted).

We find the above rationale persuasive and adopt it in full. We hold that, in Indiana, a defendant may be convicted of separate counts of stalking the same victim if the respective series of incidents upon which the charges are based can be divided into distinct and separate series. In the instant case, Peckinpaugh harassed Fillmore for a period of months, culminating in the December 6 break-in. After charges were filed and Peckinpaugh was ordered to stay away from Fillmore and refrain from contacting her, he violated the terms of that order and began once again to contact Fillmore and to violate the restrictive physical boundaries he was ordered to observe.

Having decided that a person can commit multiple stalking offenses against the

same victim, we must address another double jeopardy challenge presented by Peckinpaugh to the multiple stalking convictions. This challenge is based upon an overlap of the dates specified in the respective charging informations. In Count IV, Peckinpaugh was charged with stalking Fillmore "[b]y and between September 8, 1999, and December 6, 1999." *Record* at 14. In Count VI, Peckinpaugh was charged with stalking Fillmore "[b]y and between December 6, 1999, and February 16, 2000." *Record* at 43. The two informations overlap to the extent that they both include the date of December 6, 1999.

Until recently, Indiana courts applied a single test to determine whether a double jeopardy violation had occurred under the Indiana and United States Constitutions, respectively. That test was the so-called *Blockburger* test. *See Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). That test remains in force for double jeopardy claims arising under the United States Constitution, but Peckinpaugh advances no argument on that basis. Rather, Peckinpaugh's double jeopardy challenge centers upon the Indiana Constitution. In *Richardson v. State,* 717 N.E.2d 32 (Ind.1999), our supreme court enunciated a test for evaluating double jeopardy challenges arising under the Indiana Constitution that differs from that applied to claims arising under its federal counterpart. In *Richardson,* the court concluded that two convictions may be the "same offense" in violation of the Indiana Double Jeopardy Clause if, "with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Id.* at 49 (emphasis in original).

■ In cases where, as here, a double jeopardy challenge is premised upon convictions of multiple counts of the same offense, the statutory elements test is inapplicable, because a defendant may be charged with as many counts of an offense as there are separate acts committed. *See, e.g., Roberts v. State,* 712 N.E.2d 23 (Ind.Ct.App.1999), *trans. denied; see also Richardson v. State,* 717 N.E.2d at 50 ("[t]his inquiry is quite simple when a facial comparison of the charged crimes clearly shows that separate offenses are involved[;] [f]or example ... if a defendant is charged with robbing a particular store on Monday and then again on Friday, the offenses are, facially, not the same"). We have already concluded that the facts of this case support allegations of two separate offenses of stalking.

■ We proceed, then, to the second test enunciated in *Richardson,* which focuses upon the actual evidence presented in order to attain the convictions. Again, the potential double-jeopardy problem arises by virtue of the fact that the events alleged in the charging informations relating to the two stalking offenses overlap by one day—December 6, 1999. According to *Richardson,* in order to prevail upon this basis, "a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense." *Id.* at 53. In evaluating the evidence for this purpose, we examine not only the evidence that defense counsel presented at trial, but also the jury instructions and opening and closing argument. *Richardson v. State,* 717 N.E.2d 32.

In opening statement, the State recounted the series of events leading up to the December 5 break-in. After reciting the events culminating in that incident, the State summarized the charges stemming from that episode as including "one count of stalking". *Record* at 291. The State then went on to summarize the events that occurred after December 6, 1999 culminated on February 10, 2000. The evidence presented at trial was consistent with the State's opening statement in that it portrayed Peckinpaugh's stalking actions as

occurring during two separate time-frames—September 8 through and including December 6, 1999; and after December 6, through and including February 10, 2000. The fact that the two stalking charges were based upon entirely separate factual bases was clarified again during the State's closing argument in the following remarks:

> Did she feel fear? Yes, she felt fear. Did he know that he was putting fear in her mind? Did he know? Folks, he knew. He knew. His words. I didn't write those letters. He stalked. He stalked on the first count, where you're gonna be offered the lesser-included of the D and then he turned right around, as soon as he was out. On a monitor, he got off that monitor, he stalked her again.

*Record* at 952.

We are satisfied that, in light of the evidence presented at trial and the State's comments during opening and closing argument, there is no reasonable possibility that the two stalking convictions were based upon the same factual evidence.

### 2.

Peckinpaugh contends that the trial court imposed a manifestly unreasonable sentence.

The determination of an appropriate sentence is committed to the trial court's sound discretion. *Bonds v. State,* 729 N.E.2d 1002 (Ind.2000). Article VII, Section 6 of the Indiana Constitution gives this Court the power to review and revise sentences "to the extent provided by rule." *See Redmon v. State,* 734 N.E.2d 1088 (Ind.Ct.App.2000). We will revise a criminal sentence authorized by statute only where the sentence is manifestly unreasonable in light of the nature of the offense and the character of the offender. *Id.;* Ind. Appellate Rule 17(B). In determining whether a revision is warranted, the issue is not whether, in our judgment, the sentence is unreasonable, but whether it is clearly, plainly, and obviously so. *Id.*

Our supreme court has stated that when reviewing the reasonableness of a sentence, we should observe to the principle that "the maximum sentence enhancement permitted by law ... should ... be reserved for the very worst offenses and offenders." *Buchanan v. State,* 699 N.E.2d 655, 657 (Ind.1998) (quoting *Bacher v. State,* 686 N.E.2d 791, 802 (Ind.1997)). The trial court imposed the maximum sentences for the burglary conviction and the second stalking conviction—twenty years and eight years, respectively—and ordered that they should run consecutively. The sentences imposed on the other three convictions were imposed concurrently to the twenty-year burglary sentence, and thus had no impact on the final, executed sentence of twenty-eight years. We therefore focus our review upon the sentences for burglary and the second stalking conviction.

We see nothing in the nature of the burglary offense committed by Peckinpaugh that makes that crime a particularly egregious example of the crime of burglary. Although we do not in any way intend to downplay the emotional trauma suffered by Fillmore as a result of Peckinpaugh's unauthorized entry into her home, we note that Fillmore did not suffer personal injuries, nor did Peckinpaugh attempt to inflict injury. We note also that the entry did not cause damage to Fillmore's dwelling. For these reasons, we believe that imposition of the maximum penalty of twenty years for that offense was clearly unreasonable. We remand to the trial court with instruction to enter the presumptive sentence of ten years for the burglary conviction.

We turn now to the other sentence impacting Peckinpaugh's executed sentence, *i.e.,* the eight-year sentence imposed for the second stalking conviction. The second stalking offense occurred after Peckinpaugh defied a protective order, after charges were filed against him for the December 5 break-in, and during the brief time that the monitoring device was re-

moved at Peckinpaugh's request. In fact, it appears that Peckinpaugh's harassment of Fillmore continued unabated for months, notwithstanding the aforementioned remedial efforts by the State, and despite several warnings by law enforcement personnel of the consequences of his action. In light of these circumstances, we do not view the imposition of the maximum sentence for the second stalking conviction as clearly erroneous.

■ With respect to the decision to impose consecutive sentences for the burglary and second stalking convictions, the court explained the aggravating circumstances as follows:

> [T]his also leads to another aggravating circumstance in this case, the unusual degree of care and planning that the defendant exhibited in the process of stalking this person. It's uncanny the way he was able to get telephone numbers, addresses of new boyfriends and find himself unexplainably in her bathroom in the middle of the night, when allegedly the doors had been locked. This gentlemen [sic] exhibited a lot of care and planning in pulling all this off. Almost like it ... it was an obsession. The main thing he was thinking about in his life at the time was stalking this lady. And he does need a commitment to the Department of Corrections because we have in fact tried to rehabilitate Mr. Peckinpaugh during the process of all this. When people say a protective order's now in place, this means that the person gets a chance to clean up his act and maybe get into some counseling, get in some programming so that the next thing doesn't ... the next bad thing doesn't happen. These are signals. We're giving these people a chance to change their lives, but Mr. Peckinpaugh wouldn't. Police officers called him say [sic], "Stop doing this." This gives him a chance to show he's not gonna do it anymore and rehabilitate himself. He doesn't. I put him on a Jurist monitor, and what does he do? He finagles a trip ... an excuse to go to California for a job interview. In-

stead of rehabilitating himself, he's trying to find a way to get around it. He's had his chance at rehabilitation.

*Record* at 1127–28. The court's comments reflect its finding that Peckinpaugh was in need of correctional or rehabilitative treatment that could best be provided in a penal facility. This is a proper aggravating circumstance when accompanied by a specific statement establishing the need for such treatment in that particular case. *Price v. State*, 725 N.E.2d 82 (Ind.2000). The court's comments were sufficiently specific to establish Peckinpaugh's need for an extended incarceration in a penal facility. This aggravator, standing alone, was sufficient to support the imposition of consecutive sentences. *See Workman v. State*, 716 N.E.2d 445 (Ind.1999).

With respect to the character of the offender, we note that Peckinpaugh was fifty-two years old at the time these offenses were committed. His criminal history up until that time consisted of several minor, routine traffic infractions and four charges of class A misdemeanor check deception, one of which was pending at the time the record of the proceedings in the instant case was filed. None of the previous three charges resulted in a conviction. For the reasons set forth above, and in view of the nature and extent of Peckinpaugh's criminal history, we find that the twenty-eight year executed sentence imposed by the trial court was manifestly unreasonable, and remand with instructions to impose an executed sentence of eighteen years, consisting of the presumptive ten-year sentence for the burglary conviction, to be served consecutively to the enhanced eight-year sentence imposed for the second stalking conviction.

Judgment affirmed in part, reversed in part, and remanded.

MATTINGLY, J., and BAILEY, J., concur.