IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 23, 2001

**STATE OF TENNESSEE v. CHRISTOPHER MICHAEL VIGIL**

**Appeal from the Criminal Court for Washington County**
**Nos. 23385, 23386     Lynn W. Brown, Judge**

**No. E1999-02740-CCA-R3-CD**
**June 28, 2001**

The defendant appeals two convictions for stalking, contesting the sufficiency of the evidence and the admissibility of photographs.  We affirm one of the defendant's convictions for stalking, but we vacate the judgment of conviction for the other because the evidence reflects the existence of only one stalking offense.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part, Vacated in Part**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Steve McEwen, Mountain City, Tennessee (on appeal); David F. Bautista, District Public Defender; and Jeffery Craig Kelly, Assistant Public Defender, for the appellant, Christopher Michael Vigil.

Paul G. Summers, Attorney General and Reporter; R. Stephen Jobe, Assistant Attorney General; Joe C. Crumley, Jr., District Attorney General; and Victor J. Vaughn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant, Christopher Michael Vigil, appeals as of right from his two convictions by a Washington County jury for stalking, a Class A misdemeanor.  The trial court sentenced the defendant for each conviction to eleven months, twenty-nine days at seventy-five percent, to be served consecutively to each other.  The defendant contends that (1) the evidence is insufficient to support his convictions and (2) the trial court erred in allowing into evidence photographs of the victim's injuries resulting from an assault committed by him.

This case arises from the stalking of Sara Albritton.  At trial, Officer Tim Nickels of the Johnson City Police Department testified as follows:  He was aware that the victim lived on Highland Road because he went to her house at least ten times responding to calls regarding

domestic disputes with the defendant. However, the defendant, whom he believed to live on Boyd Street, was at the victim's house when he arrived on only one occasion. On that occasion, the defendant was in the victim's driveway. He asked the defendant to leave, which the defendant did, and he did not arrest him or issue a citation. Officer Nickels stated that he routinely drove by the victim's house because it was a "problem area" and he was concerned for the victim's welfare.

Officer Nickels testified that on another occasion he was dispatched to White's Supermarket regarding the victim who had been threatened and chased into the store. He said that the victim was in the manager's office when he arrived but that the defendant was not there. The victim was crying and appeared to be very upset. Officer Nickels stated that he did not arrest the defendant because he did not observe the misdemeanor assault being committed.

Officer Nickels testified that on another occasion he went to the defendant's parents' house in response to a domestic disturbance in progress dispatch. He said that both the defendant and the victim were there when he arrived. The victim had locked herself in the house, and the defendant had kicked in the door and brought her outside. He said that although he did not witness this event, he did arrest the defendant.

The victim testified as follows: She met and began dating the defendant, who was twenty or twenty-one years old at the time, when she was fifteen. When she turned eighteen, she moved into an apartment with him and shortly thereafter, she became pregnant. From the beginning of their relationship, the defendant verbally abused her, and later in the relationship, he also physically abused her. After their son was born, her relationship with the defendant was "horrible." The defendant continued his physical abuse, which resulted in her receiving several serious injuries. In January 1996, the defendant held her down and hit her with a shoe and then choked her. Photographs of her injuries resulting from this assault were taken at the hospital, and these photographs were introduced into evidence. She ultimately left the defendant because she knew that he was going to hurt their son and kill her.

The victim testified that after this assault, she sought an order of protection against the defendant, which was issued on January 11, 1996. At that time, she had custody of their son, and the defendant was allowed supervised visitation, which occurred at the defendant's brother's house or the defendant's mother's house. The victim said that when visitation was at the defendant's mother's house, she and the defendant's mother remained at the house. During these visits, the defendant took her into a closed room and tried to convince her to come back to him, professing his love for her and telling her that he would change.

The victim testified that between February 1996 and January 1997, the only contact other than visitation that she initiated with the defendant was when she took their son to the emergency room. She called the defendant, and his mother drove him to the hospital. While waiting to be seen by a doctor, the defendant professed his love for her and tried to get her to have sex with him. She left the hospital late that evening and agreed to drive the defendant home because the defendant's mother refused to pick him up. During the drive, the defendant threatened her, and when they

arrived at the defendant's mother's house, the defendant would not get out of the car. She said that when the defendant finally got out of the car, he grabbed her hair through the car window.

The victim testified that she never had intimate relations with the defendant after the January 1996 protective order was issued. Between February 1996 and January 1997, the defendant came to her house numerous times and beat on her windows and doors. On many of these occasions, she called 911, which she would communicate to the defendant. The defendant usually left before the police arrived.

The victim testified that the incident at White's Supermarket occurred on August 11, 1996. She said that the defendant followed her into the store and then continued to follow her through the store, ignoring her requests to be left alone. When the defendant tried to take their son out of her arms, she screamed for someone to call the police, at which point the defendant ran out of the store. She stated that because the defendant continued to follow her and threaten her, she had a second order of protection issued on January 31, 1997.

The victim, who was a student at East Tennessee State University (ETSU), said that on February 18, 1997, she had a meeting with her financial aid advisor in the administration building. When she left the building, she saw a blue Baretta that looked like the defendant's car in the parking lot. A police officer was searching the car, which had its doors and trunk opened. She did not see the defendant, although she was only about fifty yards away from the car. Seeing the car frightened her, and she went immediately to her car and drove home. A day or two later, she found out from the officer who had stopped the car that the defendant was the driver.

On cross-examination, the victim testified that she neither drove the defendant to his place of employment at the Johnson City Press nor visited him there. She also denied driving the defendant to his GED classes.

Johnson City Police Officer Chuck Carroll testified that he was dispatched to the victim's house on April 16, 1996, regarding an assault or stalking. He said that the defendant was not there when he arrived but that the victim told him that the defendant had "rammed" her car. He stated that he did not remember whether the car was damaged or whether the victim was injured.

Johnson City Police Officer Michael Adkins testified that he was dispatched to the victim's house at 5:20 a.m. on April 24, 1996, regarding a report of domestic violence. As he drove toward the house, a car that was parked in front of the house drove away. When he stopped that car, which was being driven by the defendant, he smelled alcohol and arrested the defendant. During his search of the car, he found a handgun under the driver's seat.

Johnson City Police Officer Keith Jeffers testified that he was dispatched to the victim's house on December 31, 1996, regarding an unwanted guest. He stated that the defendant was not there when he arrived. The victim said that the defendant was knocking on her door and trying to get into the house. The victim told him that the defendant drove a blue Baretta, and as he was

leaving, he saw the defendant's car approaching the house. He said that when he stopped the defendant, the defendant told him either that he was on the way to or that he was returning from work.

Johnson City Police Officer Steve Boley testified that he was dispatched to the victim's house on January 17, 1997, regarding a female being harassed. The defendant was not there when he arrived, but the victim gave him a note which she said the defendant had left on the door.

Corporal Gerald Hughes of ETSU's Public Safety Department testified that on February 18, 1997, he saw the defendant drive past the administration building, drive slowly through an adjacent parking lot, and then drive the wrong way on a one-way street. The defendant then drove this route a second time. Corporal Hughes said that he stopped the defendant the second time that he was driving the wrong way on the one-way street. The defendant said he was going to the campus pool hall. Corporal Hughes cited the defendant for driving on a revoked license. When he checked the department's records for the defendant's name, he discovered a copy of the victim's protection order against the defendant. The next day, he talked with the victim, who told him that she was in the building next to where the defendant had been driving.

Damian Garbiras, a friend of the defendant, testified that he had known the defendant for about seven years and the victim for about twelve years. He said that he, the defendant, and the victim went to Bristol to play pool sometime after the defendant stopped working at the Johnson City Press. He could not recall the date of this event. He stated that the victim and the defendant seemed to have a good relationship.

Dallas Smith, a supervisor at the Johnson City Press, testified that the defendant worked under him from about April 1996 to December 1996. During this time, the victim came to see the defendant at the Press two times – the first time for about thirty seconds and the second time for about thirty minutes. Mr. Smith said that he knew the victim because her son went to the daycare center where his wife worked.

Helen Vivian Vigil, the defendant's mother, testified as follows: The defendant and the victim had a rocky relationship, and she knew that the victim had an order of protection issued against the defendant in January 1996. During 1996, the victim came to her house numerous times to see the defendant without her son, and the victim and the defendant spent most of the time in the defendant's bedroom, where she knew they had sexual relations because she heard the victim. Although the victim always promised to bring her son to the house later, she never brought him for visitation. Ms. Vigil stated that when the victim did bring her son, she baby-sat while the victim and the defendant went out on dates.

The victim was recalled by the state and testified as follows: She did not know that the defendant ever worked at the Johnson City Press, and she never visited him there. After January 1996, she only went to the defendant's mother's house to take her son for visitation. On these occasions, the defendant would try to get her to come back to him and to have sex with him. When

she refused, the defendant would get violent, at which point she would get her son and leave. She denied ever having sex with the defendant after January 1996. She also denied going to Bristol with the defendant and Damian Garbiras after January 1996, although she stated that such a trip could have occurred before 1996.

James Hutchinson, the victim's step-father, was called as a rebuttal witness and testified that he was at the victim's house after the January 1996 protection order had been issued when the defendant's mother drove the defendant to the house. He said that he went outside and told them that they should not be there. He stated that the victim was afraid of the defendant and that he was not aware of any time that she initiated contact with the defendant after January 1996.

The defendant was called as a surrebuttal witness and testified as follows: After January 1996, the victim initiated contact with him numerous times. She visited him several times when he was working at the Johnson City Press. Also during this time, the victim brought their son to his mother's house numerous times – sometimes for visitation and sometimes for his mother to baby-sit while he and the victim went on dates. Also, the victim drove him to his GED classes several times between May and July 1996. He said that after January 1996, he and the victim were intimate not only at his mother's house but other places as well.

The defendant testified that on February 18, 1997, although he knew that his driver's license was revoked, he drove his car to the car wash. He drove home the scenic route, which included driving through ETSU, to allow his car to dry. He did not know that the victim was near where he was driving. The defendant said that he was not at White's Supermarket on August 11, 1996, and that nothing like the incident about which the victim testified ever happened.

## I. PROCEDURAL HISTORY

Initially, we note the deficiency of the record from the defendant's point of view. In his brief, the defendant assails both his convictions for stalking that were received in a consolidated trial. In a footnote, the defendant states that the convictions arose from separate indictments, Nos. 23385 and 23386 but that only Indictment No. 23385 is contained in the "technical record." The state defends both convictions, although noting that one indictment is not in the record. We view the lack of record to be greater than the parties assert. Not only do most of the trial court papers in the record refer to Indictment No. 23385, the notice of appeal refers only to Indictment No. 23385. The various papers in the record indicate some confusion about which case or cases were before the trial court at any given time. However, both parties have treated this case as an appeal of both convictions, and the record includes both judgments of conviction. Therefore, we believe that the interest of justice justifies our waiving the filing of a notice of appeal relative to Indictment No. 23386, and we will review both convictions. See T.R.A.P. 4(a).

## II.  SUFFICIENCY OF THE EVIDENCE

In Case No. 23386, the defendant was convicted for stalking the victim from February 1996 to January 1997, and in Case No. 23385, the defendant was convicted for stalking the victim on or about February 18, 1997.  The defendant argues that the evidence is insufficient to support either conviction because the proof did not establish that he intended to place the victim in fear of being assaulted or suffering bodily injury.  The defendant further argues that the evidence is insufficient to support his conviction for stalking the victim on or about February 18, 1997, because the victim never saw him on that date and there was no proof that he repeatedly followed or harassed the victim on that date.  The state contends that the evidence showed that the victim reasonably feared contact with the defendant.  Regarding the conviction for stalking on or about February 18, 1997, the state argues that stalking does not require the victim to see the perpetrator and that the evidence established repeated conduct on that date.  The state also argues that repeated conduct was established by events that occurred after February 18th.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).  We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state.  <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978).  Questions about witness credibility were resolved by the jury.  <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

"A person commits the offense of stalking who intentionally and repeatedly follows or harasses another person in such a manner as would cause that person to be in reasonable fear of being assaulted, suffering bodily injury or death."  Tenn. Code Ann. § 39-17-315(a)(1).  Further,

> (A)  "Follows" means maintaining a visual or physical proximity over a period of time to a specific person in such a manner as would cause a reasonable person to have a fear of an assault, bodily injury or death;
>
> (B)  "Harasses" means a course of conduct directed at a specific person which would cause a reasonable person to fear an assault, bodily injury, or death, including, but not limited to, verbal threats, written threats, vandalism, or unconsented-to physical contact; and
>
> (C)  "Repeatedly" means on two (2) or more separate occasions.

Tenn. Code Ann. § 39-17-315(a)(2)(A)-(C).

Regarding the conviction for stalking the victim from February 1996 to January 1997, the evidence viewed in the light most favorable to the state reveals the following:  Johnson City Police

Officer Chuck Carroll testified that he was dispatched to the victim's house on April 16, 1996, regarding an assault or stalking and that the victim told him the defendant had "rammed" her car.

Officer Michael Adkins testified that he was dispatched to the victim's house on April 24, 1996, regarding a report of domestic violence. As he drove toward the house, a car that was parked in front of the house drove away. When he stopped that car, which was being driven by the defendant, he smelled alcohol and arrested the defendant. During his search of the car, he found a handgun under the driver's seat.

Johnson City Police Officer Keith Jeffers testified that he was dispatched to the victim's house on December 31, 1996, regarding an unwanted guest. Although the defendant was not there when he arrived, the victim said that the defendant was knocking on her door and trying to get into the house. The victim told him that the defendant drove a blue Baretta, and as he was leaving, he saw the defendant's car approaching the house.

Johnson City Police Officer Steve Boley testified that he was dispatched to the victim's house on January 17, 1997, regarding a female being harassed. When he arrived, the victim gave him a note which she said the defendant had left on the door.

Officer Tim Nickels testified that he went to the victim's house at least ten times responding to calls regarding domestic disputes with the defendant. He stated that he routinely drove by the victim's house because it was a "problem area" and he was concerned for the victim's welfare. He said that on one occasion he was dispatched to White's Supermarket because the victim had been threatened and chased into the store. The victim was in the manager's office when he arrived and was crying and appeared to be very upset. The victim testified that this incident occurred on August 11, 1996, and that the defendant followed her into the store and then continued to follow her through the store, ignoring her requests to be left alone. When the defendant tried to take their son out of her arms, she screamed for someone to call the police, at which point the defendant ran out of the store.

The defendant argues that the evidence failed to establish that the victim feared being assaulted by defendant, emphasizing that there was evidence that the defendant's relationship with the victim was harmonious and that the victim initiated contact with him after January 1996. However, the victim testified that the defendant verbally and physically abused her and that she was afraid of the defendant. She specifically testified about the defendant assaulting her in January 1996 and that she left the defendant because she was afraid that he would kill her. She said that she had protection orders issued against the defendant because she was afraid of him. Moreover, the victim testified that the only contact other than visitation that she initiated with the defendant was when she took their son to the emergency room, an event that resulted in the defendant threatening her. The jury heard the conflicting evidence, and it was within its prerogative to reject the defendant's proof and find that the victim reasonably feared being assaulted or suffering bodily injury or death when the defendant followed and harassed her. We conclude that from the above evidence, a rational jury could have found beyond a reasonable doubt that the defendant stalked the victim between February 1996 and January 1997. Accordingly, we affirm the defendant's conviction in Case No. 23386.

Regarding February 18, 1997, the evidence in the light most favorable to the state reveals that the victim was in ETSU's administration building and that during this time, the defendant drove on the street next to the building, drove slowly through an adjacent parking lot, and then drove the wrong way on a one-way street. The defendant then circled the building in this manner a second time. The second time that the defendant drove the wrong way on the one-way street an ETSU officer stopped him. While the defendant was pulled over, the victim came out of the building and saw the defendant's car about fifty yards from her, which frightened her. She then went immediately to her car and drove home. The victim did not see the defendant on this date but was told a day or two later that the defendant was the driver of the car that she had seen.

The defendant argues that this evidence is insufficient because the victim did not see the defendant, and thus, could not have reasonably feared being assaulted or suffering bodily injury or death. The state, relying on the definition of "follows," argues that stalking does not require the victim to see the defendant. We agree with the state.

"Follows" is defined as "maintaining a visual or physical proximity over a period of time to a specific person in such a manner as would cause a reasonable person to have a fear of an assault, bodily injury or death." Tenn. Code Ann. § 39-17-315(a)(2)(A). In this case, the evidence established that while the victim was in the administration building, the defendant maintained a physical proximity to her when he twice drove past the building and through an adjacent parking lot. The victim testified that the defendant had physically abused her and that she was afraid of the defendant. She said that seeing the defendant's car on this occasion frightened her. Moreover, the fact that the victim saw the defendant's car but not the defendant when she came out of the building does not make her fear of an assault or bodily injury less reasonable. Indeed, because she did not see the defendant, she did not know whether the police had apprehended him. We conclude that a rational jury could have found beyond a reasonable doubt that the defendant "followed" the victim on February 18, 1997.

The defendant next argues that the February 18th incident does not establish repeated conduct. The state first responds that the defendant's actions were repeated because he circled the building two times. The state cites no authority for this position, and we note that no Tennessee cases support this position. Nor does the plain language of the statute, which defines repeatedly as "on two (2) or more separate occasions." Tenn. Code Ann. § 39-17-315(a)(2)(C) (emphasis added). The defendant's driving around the building twice was a continuous event, and we conclude that this conduct does not constitute two separate occasions.

The state, relying upon State v. Gieck, 29 S.W.3d 57 (Tenn. Crim. App. 1999), also argues that repeated conduct was established by events that occurred after February 18, 1997, specifically that the defendant mailed the victim a letter on March 17, 1997. We note that the state cannot, and does not attempt to, establish repeated behavior by relying upon the events occurring between February 1996 and January 1997 because those events were included in the indictment for Case No. 23386.

In Gieck, an indictment for stalking provided that the offense occurred "on or about the 12th day of November, 1997," but also stated that the defendant followed the victim in his car and telephoned the victim's house on numerous occasions. Id. at 60. The proof established numerous incidents of these types of harassment occurring between December 1996 and November 12, 1997. This court held that there was not a material variance between the indictment and the proof at trial, stating that "the defendant was given sufficient notice that he was to be prosecuted for a series of stalking and harassing telephone calls over a time period, not withstanding the single date of an offense alleged in the indictment." Id. at 61.

In this case, unlike in Gieck, the indictment does not contain a description of the stalking or of its frequency. In any event, the record reveals that the only evidence of the defendant following or harassing the victim after January 1997 was the February 18th incident at ETSU and the March 17th letter. The March 17th letter states:

> You were right Sara and after a lot of thinking I now realize just how wrong I was and I hope you know I mean about everything for the unspeakable way that I treated you and for not respecting your wishes when you needed time and space. I'm going to try to go on with my life and make a better man out of myself and I will work very hard to work on my problems, and I hope in time you will see that the person you fell in love with is worthy of your trust once again, and I pray to god every night for forgiveness, because Sara the way I see it you were my gift from the good lord and a part of my life and nobody ever loved me like you did and I want to remind you that I remember everything you ever did for me and the times we shared and to think that you would still be loving me right now, if I didn't f*** it up.

While this letter is not threatening on its face, the defendant's mere contact with the victim through this letter, regardless of its substance, may be sufficient to establish harassment as defined by the stalking statute, given the history between the parties and the fact that the defendant had made similar assertions in the past but continued to follow and/or harass the victim. See, e.g., State v. Charles B. Treadwell, No. 01C01-9705-CR-00166, Davidson County, slip op. at 7 (Tenn. Crim. App. Aug. 28, 1998), app. denied (Tenn. Mar. 22, 1999) (relying on previous conduct by the defendant, including threats made to the victim's mother and an assault against the victim's aunt, to hold that the evidence sufficiently established that the defendant's mere presence in the victim's vicinity placed the victim in reasonable fear of a sexual offense, bodily injury, or death).

Regardless, from the record before us, the February 18th incident and the March 17th letter cannot be separated from the events occurring between February 1996 and January 1997 to establish a second stalking offense. Stalking is a continuing offense. It requires repeated conduct, which means two or more separate occasions. See Tenn. Code Ann. § 39-17-315(a)(2)(C). In State v. Hoxie, 963 S.W.2d 737, 743 (Tenn. 1998), our supreme court stated that "the crime of stalking is not committed upon a single, discrete act by the defendant . . . . Instead, the statute which defines stalking as a criminal offense contemplates a series of discrete actions amounting to a continuing course of conduct." From the record before us, there is no indication that an event occurred before

the February 18, 1997 incident to break the continuous course of conduct that constituted the stalking offense as charged in Case No. 23386, which covered the events from February 1996 to January 1997. Accordingly, the February 18th incident and March 17th letter appear to be merely additional discrete actions of following and harassing the victim that occurred as part of the continuing course of conduct that began in February 1996. The Double Jeopardy Clause protects the defendant from being punished for multiple counts of stalking for actions, although separate, that constitute only one offense of stalking. See State v. Rhodes, 917 S.W.2d 708, 713 (Tenn. Crim. App. 1995); State v. Davis, 654 S.W.2d 688, 696 (Tenn. Crim. App. 1983).

We note that in this case, a second order of protection was issued on January 31, 1997, the first order having expired on January 16, 1997. In Hoxie, the defendant was charged with two counts of stalking – one count for misdemeanor stalking covering events from January through May 1994 and one count for felony stalking covering events from June through October 1994. The "break" between these periods was the issuing of a no contact order of protection against the defendant. Id. at 739. At the time of the offenses in Hoxie, however, the offense of stalking was elevated from a Class A misdemeanor to a Class E felony when committed while a court order of protection was in effect. See Tenn. Code Ann. § 39-17-315(b) (1994 Supp.) (amended 1995). Effective July 1, 1995, this portion of the statute was deleted, and therefore, does not apply to this case. Thus, the January 31, 1997 order of protection in this case did not have the same effect as the one in Hoxie. We cannot conclude that the January 31, 1997 protection order constituted a break from the defendant's continuous course of conduct that would have allowed the state to charge the defendant with multiple counts of stalking.

Although stalking is a continuing offense, some events break the defendant's continuing course of conduct. We note that other jurisdictions have held that being charged with stalking a victim would constitute a break in the continuous course of conduct with respect to that victim. In State v. Jones, 678 So. 2d 1336, 1337 (Fla. Dist. Ct. App. 1996), the defendant was arrested and charged with stalking the victim but continued to harass the victim by way of letters and telephone calls. The defendant was convicted on two counts of stalking – one count for conduct occurring before he was charged with stalking and a second count for conduct occurring after he was charged. The defendant argued that because stalking was a continuing offense, he could not be charged for two offenses. The court held that the defendant's arrest for stalking "concluded the factual event which formed the basis for the arrest," and subsequent actions "began a separate and distinct factual event." Id. at 1338. In Peckinpaugh v. State, 743 N.E.2d 1238 (Ind. Ct. App. 2001), the defendant was convicted on two counts of stalking. One count covered events over a period of months ending with the defendant being arrested and charged with stalking after he broke into the victim's house. The second count covered the defendant's conduct after charges had been filed. The court stated that "a defendant may be convicted of separate counts of stalking the same victim if the respective series of incidents upon which the charges are based can be divided into distinct and separate series." Id. at 1242. The court upheld the defendant's two convictions for stalking, concluding that the actions after the defendant had been charged with stalking constituted a distinct and separate series of actions.

We agree with the Jones and Peckinpaugh holdings that being charged with stalking a victim concludes the continuous course of conduct underlying that charge and that subsequent actions relate to a new series of conduct. If being charged with stalking does not begin a new series of conduct, then a defendant charged with stalking could continue to follow or harass the victim with his or her additional actions only adding to the continuous course of conduct underlying the pending charge. Another stalking charge could not be brought. Moreover, because not all of the actions that constitute following or harassing are separate and distinct criminal offenses, see Hoxie, 963 S.W.2d at 743, no other charges could be brought in some cases, resulting in the defendant having no bar to continue stalking the victim after being charged with stalking. Accordingly, we conclude that being charged with stalking a victim breaks the continuous course of conduct underlying the charge and that subsequent following or harassing of the victim relates to a new offense.

However, in this case, from the record before us, the defendant was not charged with stalking before the February 18th incident. The record does not reveal a break between the defendant's continuous course of conduct from February 1996 to January 1997, the period of events in Case No. 23386, and the February 18th incident and March 17th letter. The Double Jeopardy Clause protects the defendant from being punished twice for the same offense. Accordingly, we vacate the judgment for stalking in Case No. 23385.

## III. ADMISSIBILITY OF PHOTOGRAPHS

The contested photographs were taken when the victim went to a hospital after being assaulted by the defendant in January 1996. This assault led the victim to seek an order of protection against the defendant. The trial court allowed the photographs, finding that they were relevant to showing that the victim feared the defendant. The defendant does not contest this finding. Rather, he argues that the trial court erred in allowing the photographs into evidence because their probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. See Tenn. R. Evid. 403.

To be admissible, a photograph must be relevant to some issue at trial and the danger of unfair prejudice, confusion of the issues, or misleading the jury must not substantially outweigh its probative value. See State v. Banks, 564 S.W.2d 947, 949-50 (Tenn. 1978). The determination of the admissibility of photographs lies within the sound discretion of the trial court, and that discretion will not be overturned on appeal absent a clear showing of abuse. State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992) (citing State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985)).

In this case, the photographs showed the victim's injuries from an assault committed by the defendant. The injuries consisted only of bruises on her arms, shoulder, and face. None of photographs are gruesome. Moreover, part of the defendant's theory was that the victim did not fear him because she initiated contact with him. Because the fear element of the offense was contested, the photographs' probative value was increased. We cannot conclude that the trial court abused its discretion in allowing the photographs into evidence.

Based upon the foregoing and the record as a whole, we affirm the defendant's conviction in Case No. 23386.  However, we vacate the judgment of conviction for stalking in Case No. 23385.

_____
JOSEPH M. TIPTON, JUDGE