NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0016n.06

Case Nos. 23-5045/5047

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| DANIEL CREGER, | ) | **FILED**<br>Jan 11, 2024<br>KELLY L. STEPHENS, Clerk |
|     Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ANDREW TUCKER (23-5045); TOWN OF | ) | COURT FOR THE MIDDLE |
| SMYRNA, TENNESSEE (23-5047), | ) | DISTRICT OF TENNESSEE |
| | ) | |
|     Defendants-Appellants. | ) | O P I N I O N |
| | ) | |

Before: McKEAGUE, STRANCH, and NALBANDIAN, Circuit Judges.

**McKEAGUE, Circuit Judge.** Andrew Tucker, a law enforcement officer in the Town of Smyrna Police Department, appeals the district court's denial of qualified immunity against two malicious-prosecution claims filed by Daniel Creger under 42 U.S.C. § 1983. The Town of Smyrna, co-defendant in Creger's suit, similarly challenges the district court's order.[1] The court below denied the defendants' motions for summary judgment because none of the parties had clearly identified undisputed facts that were relevant and material to the claims at issue. Tucker argues that the district court erred by (1) failing to find, as a matter of law, that he did not commit a constitutional violation and (2) failing to find that no clearly established law, on the particularized facts of this case, would have put him on notice that his acts were unlawful. The Town of Smyrna argues that because there was no constitutional violation in the case, this Court possesses pendant

---

[1] In citations, briefs for case number 23-5045 are "Tucker Appellant's Brief," "Creger I Appellee's Brief," and "Tucker Reply Brief." Citations to briefs in case number 23-5047 do not appear.

jurisdiction over the district court's denial of summary judgment. On the merits, the Town argues we should reverse.

Because Officer Tucker did not commit a constitutional violation, we **REVERSE** the district court's denial of summary judgment to Tucker and the Town of Smyrna on both claims.

## I. BACKGROUND

This appeal arises as the result of a contentious divorce that spilled over into a criminal investigation, criminal charges of harassment and stalking, and acrimonious litigation that ended up ensnaring the Town of Smyrna Police Department. On February 4, 2021, Daniel Creger sued Officer Andrew Tucker and the Town of Smyrna ("the Town" or "Smyrna") under 42 U.S.C. § 1983 for two counts of malicious prosecution. Creger alleged that Officer Tucker, a police officer in the Smyrna Police Department, filed two sets of unfounded criminal charges against Creger in May and June 2019. Specifically, Creger alleged that Officer Tucker filed two sets of misleading warrant affidavits—one for stalking and harassment on May 22, 2019, and another for aggravated stalking and criminal contempt on June 6, 2019. From those charges came several court appearances, brief incarceration, dismissal and expungement of Creger's criminal records, and protracted § 1983 litigation.

This case presents a thorny factual and procedural history—a problem created in large part by the parties. Officer Tucker and Smyrna made the inexplicable choice to present to the district court a statement of facts that contained 315 "purportedly" material facts. Order Den. Summ. J., R.98 at PageID 1462. Creger's actions did not help. In his response, he disputed more than fifty of those facts in whole or in part. Even where he did not dispute certain facts for the purpose of summary judgment, he often felt the need to lodge separate objections—ones that were generally irrelevant to the factual accuracy of the defendants' statements. By the time Creger filed his response to the defendants' statement of facts, the document had "balloon[ed]" to ninety-five pages. *Id.* In support of their proposed statement of facts, Officer Tucker and Smyrna filed more

than 220 pages of exhibits. In response, Creger filed a staggering 450 pages of exhibits—in support of only two malicious-prosecution claims. Because of the parties' tactics, the district court chose not to "determine whether the *relevant* and *material* facts are truly undisputed," given the "voluminous filings" each party made in support of its position. *Id.*

Ultimately, the district court made no factual findings, determining that neither party carried its burden to establish that any material facts were or were not genuinely disputed. The court also declined to find explicitly that Tucker and Smyrna were not entitled to judgment as a matter of law, resting solely on its determination that neither party had properly shown that factual disputes permitted or precluded summary judgment. We note here that, although the parties' litigation tactics unnecessarily complicated this lawsuit and appeal, the district court also bears some of the blame for failing to identify whether any material facts were subject to genuine dispute. Qualified immunity is an immunity from suit, an immunity that may be lost if officers are erroneously subjected either to trial or to undue litigation burdens. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). It must be addressed at the "earliest possible stage of litigation." *Goad v. Mitchell*, 297 F.3d 497, 501 (6th Cir. 2002). As understandable as the district court's frustration at the parties' litigation strategies might be, its failure to issue a substantive ruling on qualified immunity in this case was improper. If the district court believed the parties' filings prevented it from making a substantive ruling, it had several tools at its disposal: striking the filings, perhaps, or ordering refiling with page limitations or supplemental briefing.

Regardless, we may conduct our own review of the record to resolve this particular case. On appeal of a denial of qualified immunity, we construe the facts in the light most favorable to the plaintiff. *Coffey v. Carroll*, 933 F.3d 577, 584 (6th Cir. 2019). Because the district court did not make any factual findings, we undertake here a "detailed evidence-based review of the record" so that we may accurately assess Officer Tucker's legal claims on appeal. *Johnson v. Jones*, 515 U.S. 304, 319 (1995). So, in service of our jurisdiction and of properly assessing factual disputes

where a denial of summary judgment is before us, the factual recitation that follows broadly assumes the plaintiff's facts to be true where any such facts are disputed.

We note that, for the purposes of this appeal, the parties do not dispute that Officer Tucker's involvement in Creger's prosecution ended after Tucker wrote and submitted his arrest warrants. Because malicious-prosecution claims under § 1983 turn on an officer's actions to the extent that the officer "made, influenced, or participated" in the state's eventual choice to prosecute, *Coffey*, 933 F.3d at 590 (quoting *King v. Harwood*, 852 F.3d 568, 583 (6th Cir. 2017)), we generally limit our factual recitation here to those facts in the record that bear on what Officer Tucker knew—or should have known—at the time that he swore each warrant affidavit.

## A.    Family History

Daniel and Evon Creger married in August 2005. Soon after their marriage, Daniel Creger[2] was charged for two misdemeanor domestic abuse counts in Wisconsin that he allegedly committed against Evon while she was pregnant with the couple's first child. Following a 2008 jury trial, he was convicted only on the lesser of the two charges. The couple shares two minor daughters: K.C., who was thirteen years old in 2019 when Officer Tucker filed criminal charges against Creger, and A.C., who was eleven years old at the time.

On January 18, 2019, Evon Creger petitioned for divorce. On May 6, she amended her petition. Following that, Evon rented a house on Easy Goer Way in Smyrna and moved in with her daughters. Upon moving, Evon took care not to share her new address with Creger, explaining later that she did not want him to know her new address because of their history together. As of May 22, 2019, only a couple of weeks after Evon moved with her daughters into a new residence, Creger and Evon had not yet agreed on a specific parenting plan for sharing custody of their children. Because they needed to coordinate schedules to take care of their daughters, Creger and his wife communicated fairly frequently through both email and text messages. Those

---

[2] Referred to here as "Creger." Evon Creger appears as "Evon" or "Evon Creger."

communications set the stage for the events that formed the basis for Daniel Creger's first set of criminal charges, which is when Officer Tucker entered the picture.

**B.       Facts Underlying Creger's First Claim for Malicious Prosecution**

Early on the morning of May 22, 2019, Evon texted Creger to ask if he would be interested in picking up his daughters from school: "Would you like to pick up [A.C.] today? [K.C.] gets off the bus at 3:30pm, [A.C.] can be picked up as early as 3:15pm. I can come by and get them around 7pm." May 22 Text Messages, R.84-5 at PageID 648. Creger did not respond for more than five hours, prompting Evon to text him again in the late morning: "Please respond by noon. Thank you." *Id.* At 11:44 AM, Creger said, "Sure I'll pick them up. I'll bring them back to your house, what is the address?" *Id.* at PageID 649. Soon after, Creger added, "Plus I have added $500 more dollars into the account than you, please add the funds or subtract it from what is due for the lacrosse stuff." *Id.* Evon did not respond, later claiming—in a deposition—that she became scared because the "gap in time" between texts was "completely out of character" for Creger. Evon Creger Dep., R.84-14 at PageID 677. As she explained in her eventual call to Smyrna Police dispatch, she believed that Creger "got news today that someone in his family . . . was being investigated for inappropriate things with one of our daughters." Dispatch Recording at 04:17. After several hours, Creger broke the (textual) silence at 2:24 PM, saying, "Seriously I don't understand why you are not giving me your address, it is probably easy to find… I'm entitled to know where my daughter's [sic] are sleeping." May 22 Text Messages, R.84-5 at PageID 650 (ellipsis in original).

Evon Creger claims she became frightened after receiving this final message; Officer Tucker claims she later disclosed that fact to him. *See* Tucker Appellant's Br. 36; Evon Creger Dep., R.84-14 at PageID 677. No record document—other than Officer Tucker's post-interview reports, *see* May 22 Incident Report, R.84-3 at PageID 645—directly indicates that Evon Creger explicitly communicated to Officer Tucker her emotional state following this text exchange, a point that Creger argues vehemently on appeal. The parties agree, though, that Evon decided to

call her divorce attorney to describe the exchange she had with Creger, who suggested that Evon—rather than Creger—pick up the two girls.

So, sometime before 3:30 PM on May 22, Evon picked up A.C. from her afterschool location and K.C. from where she got off the bus. Creger also attempted to pick up A.C. but found that she had already left with Evon. Creger drove toward K.C.'s bus stop, stopping at a red light at approximately 3:30 PM. At exactly the same time, Evon stopped at the same intersection, directly across from Creger's car. Having seen Creger across the intersection, Evon texted him: "Please have your attorney contact my attorney. I have the girls. They are safe and happy." May 22 Text Messages, R.84-5 at PageID 650. Creger immediately responded, "No deal!" *Id.* at PageID 651. Evon did not respond.

Both Evon and Creger began driving away from the intersection, with Creger pulling behind Evon's car while she drove. The parties disagree on exactly *how closely* Creger followed Evon, but the parties do not dispute that Creger *followed* Evon and that Evon later told Smyrna Police Dispatch that Creger had been following her car "in a very threatening manner." Dispatch Recording at 01:00–01:11. In the following minutes, Creger sent another series of texts: "You are keeping me from the girls…." and "See you in court, the judge is going to not like this." May 22 Text Messages, R.84-5 at PageID 651 (ellipsis in original). During this time, Creger followed Evon's car—with their daughters inside—for several miles. Eventually, Creger's and Evon's paths diverged—Evon later told Smyrna Police Dispatch that she had contacted her divorce attorney, who advised her to drive to the police department. Creger disputes on appeal many facts that Officer Tucker presents about exactly what Creger's daughters saw, felt, and said while their parents engaged in this behavior. But Creger concedes that, at a minimum, Evon told Officer Tucker that one of her daughters said, "Dad is following us, Mom." May 22 Evon Creger Witness Statement, R.84-4 at PageID 646.

Upon arriving at the Smyrna Police Department, Evon went inside the lobby and called police dispatch. In the call, Evon asked for an officer to meet her so that she could file a report.

She indicated that she was in the midst of a divorce, that she had a custody hearing scheduled for May 30, that she had just picked up her daughters, and that her husband had followed her car "in a very threatening manner." Dispatch Recording at 00:35–01:05. She described to dispatch the route that she, her daughters, and Creger had taken before Creger stopped following the car, indicating that she thought he had "started figuring out" that Evon was driving to the police department. *Id.* at 01:23–01:35, 02:30–03:00. She stressed that she perceived him to be following her car very closely, emphasizing that her daughters were in the car and that "they said" to her that their father was following them. *Id.* at 03:05–03:13. She told dispatch that Creger did not have her current address and that he had a history of anger and domestic violence. She also conveyed her belief that Creger had received news about an investigation Evon had been seeking regarding allegations one of her daughters made about Creger's mother. Because she believed he had found out about this investigation, Evon told dispatch that his "eerie radio silence" following her initial text led her to question his mental state. *Id.* at 04:50–05:06. She then indicated that Creger's message asking for her address—which she said he knew she did not want to give him—and then saying the address was "easy to find…" led her to call her attorney, pick up her daughters, and go to the police on her attorney's suggestion. *Id.* at 05:55–06:12, 06:28–06:43.

Smyrna Police dispatched Officer Tucker to speak with Evon and her daughters at the police department. Construing the evidence in Creger's favor, the parties agree that Evon described the incident to Officer Tucker, who summarized the conversation later in an incident report. During the interview—which was recorded but that the Smyrna Police Department failed to preserve, *see* Creger I Appellee's Br. 29–30—Evon showed Officer Tucker the texts that she and Creger had exchanged. She also sent him an electronic copy of the messages. Officer Tucker further interviewed the couple's daughters. Upon finishing the interview, Evon completed and signed a written statement describing the day's events, generally repeating facts she described on the call to Smyrna Police Dispatch. Relevant to the disputes before us on appeal, Evon indicated in her statement that one of her daughters told her that Creger was following them. Evon also stated that

she responded to Creger's texts—saying to contact her attorney—at her attorney's "direction." May 22 Evon Creger Witness Statement, R.84-4 at PageID 646–47. Missing from that statement is any description of her or her daughters' mental or emotional states.

At 4:50 PM that day, Officer Tucker called Creger to talk to him about the events that had occurred earlier in the afternoon. Officer Tucker explained that he had spoken with Evon, who had told Tucker there had been an "issue" with Creger "following" Evon earlier in the day. Tucker–Creger Recording at 00:26–00:40. Creger responded, "She took off with my children." Tucker said, "Okay." Creger continued, "I almost called 911." *Id.* at 00:40–00:42. Creger did not deny that he had followed Evon. Officer Tucker asked Creger to explain, and Creger told him that they agreed he would pick up his daughters and that Creger believed Evon had decided to withhold their daughters from him. Officer Tucker told Creger that Evon was worried—that she had a "fear"—that Creger was trying to figure out where she currently lives. *Id.* at 01:09–01:14. Creger objected, claiming it was his right to know where his daughters lived. Officer Tucker rejoined, "No, it's not." *Id.* at 01:17. Tucker further stated that because no parenting plan was in place, Evon could take her daughters where she wanted.

Officer Tucker explained to Creger that he had seen the text messages between the two parents, and he indicated to Creger that he thought Evon had become scared when Creger asked for her address. After Tucker questioned Creger multiple times about why he had followed his wife and daughters for several miles, Creger responded—twice—that "we had an agreement" that "I was supposed to have the kids." *Id.* at 03:54–04:08. Upon further questioning, Creger invoked his right to have an attorney present. In response, Officer Tucker said, "Okay. That's fine. As of right now, I'll probably be taking out a harassment charge against you, as well as a stalking charge. So I'll be in contact with you to see about you coming to turn yourself in in a little while, okay?" *Id.* at 04:27–04:39. The call terminated.

Immediately afterward, Officer Tucker filled out two warrant affidavits against Creger: one for harassment in violation of Tennessee Code § 39-17-308 and one for stalking in violation of § 39-17-315. The probable cause testimony in the harassment affidavit read, in its entirety:

> On 5/22/2019, Daniel Creger was told by Evon Creger, his wife/victim, to have his attorney contact her attorney for future conversation. Mr. Creger then sends 3 messages in repetition first "No deal!". Then, "You are keeping me from the girls….". Finally, ["]See you in court, the judge is not going to like this.". This stems from Ms. Creger not telling him what her new home address is as they are currently going through a divorce. After being told to cease direct contact was followed by a string of texts that the victim felt was annoying and offensive.

May 22 Harassment Aff., R.84-7 at PageID 654 (ellipsis in original). The probable cause testimony in the warrant for stalking read, in its entirety:

> On 5/22/2019 Daniel Creger texted Evon Creger (wife/victim), asking for her address in reference to dropping off their children at her new home. Mrs. Creger and the offender are currently going through a divorce, and she does not want him knowing where she lives, as she states Mr. Creger has a history of violence, and she is afraid to tell him where she lives.
>
> She does not answer the text, and he then sends another text saying "Seriously I don't understand why you are not giving me your address, it is probably easy to find… I'm entitled to know where my daughter's are sleeping." After this the victim was instructed by her attorney to not let him have the children. She went to the bus stop where Mr. Creger was supposed to pick up one of the children. She was able to get the child at Almaville Farms apartments, but the children noticed their father following behind Mrs. Creger after she right [sic] to leave the apartment complex.
>
> The children and Mrs. Creger stated that he was following extremely closely, and could physically see the father in the driver seat, and a sticker in the upper corner of the car that matches the same sticker on the same Audi sedan owned by the father. Mr. Creger followed them from Almaville Rd to Interstate 24, to Sam Ridley Pkwy W, and finally left the area around the intersection of Sam Ridley and Old Nashville Hwy. This caused Mrs. Creger enough emotional distress that she felt the only safe thing to do was drive to the Smyrna Police Department rather than go to her home.

May 22 Stalking Aff., R.84-8 at PageID 655 (ellipsis in original) (paragraph breaks added for legibility). Officer Tucker presented these two affidavits to a Smyrna Municipal Court judicial commissioner, who reviewed and signed the affidavits, authorizing Creger's arrest.

The two charges that resulted from Officer Tucker's May 22 affidavits form the basis for Creger's first § 1983 claim of malicious prosecution.

**C.    Facts Underlying Creger's Second Claim for Malicious Prosecution**

The events leading to the second set of charges that Andrew Tucker filed against Daniel Creger began immediately after Tucker swore the first set of warrant affidavits.

On the evening of May 22, 2019, Evon Creger sought and obtained an ex parte civil order of protection against Daniel Creger. Officer Tucker—who, according to Creger, helped Evon obtain the order—signed the proof-of-service section on the order immediately after the judicial commissioner authorized it. Officer Tucker signed the order in the location designating that it had been served on the respondent—Creger—even though it had not been. Tucker attributes this to mistake. Creger, at least in his pleadings before the district court, disputes that Officer Tucker's act was unintentional. Among other things, the order required Creger not to "frighten," "stalk," "come about," or contact "either directly or indirectly" Evon and their two daughters. Order of Protection, R.84-12 at PageID 668. The order directed the parties to appear at a hearing regarding continuing the order on June 3. Evon's divorce attorney emailed Creger's divorce attorney on the morning of May 23, 2019, notifying Creger's attorney that Evon had obtained a protection order against Creger. The parties dispute, though, whether Creger knew about that order at the same time. At the latest, Creger concedes, he became aware of the civil order by June 3, which is when Creger's and Evon's attorneys agreed to consolidate the ex parte order with the divorce action. On June 3, Creger went to the police department to complain about Officer Tucker filing criminal charges against him. Importantly, Creger concedes that Officer Tucker knew—prior to filing the June 6 warrant affidavits—that Creger had gone to the Smyrna Police Department on both June 3 and June 4 to complain about the May 22 charges and the ex parte civil order.

Earlier, though, on May 24, Creger went to the Smyrna Police Department to turn himself in on the May 22 warrants. After being taken into custody, Creger appeared before another judicial

commissioner, who gave Creger a court date of June 5 and signed an order granting bail. Creger signed and dated the form outlining bail conditions. The conditions—which Creger admits he received in this May 24 hearing—directed Creger to, among other things, "stay away from the home of the alleged victim and to stay away from any other location where the victim" Evon is "likely to be." Pl.'s Resp. to Defs.' Joint Statement of Facts, R.91 at PageID 1560.

Creger then made his appearance on June 5 in Smyrna Municipal Court for the May 22 harassment and stalking charges. At the hearing, a municipal and general sessions judge for the Town of Smyrna went over Creger's criminal bond conditions with him, making clear that Creger was to have "no contact" with Evon Creger. Judge Aff., R.84-21 at PageID 709–10. Creger's attorney asked the judge if the conditions prevented Creger from speaking with his daughters. The judge—whose jurisdiction does not include chancery court civil orders of protection and who had not been informed of any other court orders by the parties' attorneys—told Creger that, based on the bond conditions, he could speak with his daughters. *Id.* at PageID 710. That evening, Creger sent K.C. a text, which he ended by asking K.C. to tell A.C. that he also missed her. K.C. did not respond. Creger sent K.C. three additional text messages on June 6. Again, K.C. did not respond.

Also on June 5, Evon learned that a neighbor had seen Creger on Easy Goer Way, where she had moved with the couple's daughters. Evon called Smyrna Police Dispatch to speak with Officer Tucker, who returned her call on June 6. Officer Tucker claims Evon told him when they spoke that Creger had somehow "located her address." Tucker Appellant's Br. 17. Creger disputes that fact, largely because Evon's second witness statement—which she made following her June 6 conversation with Officer Tucker—does not contain that allegation. *See* June 6 Evon Creger Witness Statement, R.84-24 at PageID 728. Officer Tucker's incident report, which he also made after speaking with Evon, says that Creger "had located [Evon's] address." June 6 Incident Report, R.84-23 at PageID 724.

After speaking with Evon over the phone on June 6, Officer Tucker ventured to Easy Goer Way to speak with the witnesses Evon had identified. First was Grant Inghram, one of Evon's

neighbors. Grant's witness statement indicates that Evon's sister had, the week before, asked Grant whether he had ever seen a black Audi A8—Creger's car—on the street. According to the statement, Grant then saw that car on June 2 pulling into the driveway of an open house that Grant's wife, a realtor, was hosting on the street. Grant saw Creger's car leave the open house, drive toward Evon's house, abruptly change direction, and leave the neighborhood going the opposite way.

Officer Tucker then spoke with Grant's wife, Lindsey Inghram, who also wrote a witness statement. Lindsey confirmed she had hosted an open house on June 2. She also confirmed that Creger had attended. In her statement, Lindsey said that Creger showed "little interest" and asked "no questions about" the property. L. Inghram Witness Statement, R.84-24 at PageID 729. Because, she claimed, there were no signs in the area directing members of the public to the open house, she thought his explanation that he knew about the open house from driving around the neighborhood seemed "odd." *Id.* According to Lindsey's statement, she asked Creger about his work, and they talked about the fact that he was going through a divorce. Because Creger "didn't have an agent" and "had no timeline to move," Lindsey wrote that she felt he was "not a legit buyer." *Id.*

Creger contends that his presence on June 2 at an open house on the same street where his soon-to-be-divorced wife and daughters lived was a complete coincidence. And, given the factual posture of this appeal, we take him at his word. Indeed, certain evidence suggests that Creger did not intentionally violate his bond conditions, which he admits he knew about because of his appearance in Smyrna Municipal Court on May 24. For instance, Creger later explained in a deposition that his abrupt about-turn and departure from the neighborhood stemmed from the fact that he had recognized one of his daughters outside Evon's house and realized that he needed to leave the area to avoid violating his bond conditions. But Creger does not—and cannot—dispute that the Inghrams' declarations to Officer Tucker contain statements indicating that they found Creger's actions suspicious.

After speaking with Lindsey and Grant Inghram, Officer Tucker then spoke to Evon and K.C. at their house on Easy Goer Way. They told Officer Tucker about the texts that Creger had sent to K.C., providing Officer Tucker with screenshots of the texts for his police report. Tucker then went to a neighboring sheriff's office to take out three warrants for violations of the civil order of protection. In his police report that evening, Officer Tucker stated that Creger was "made aware" of the civil protection order on May 24 when he turned himself in on his first set of criminal charges. June 6 Incident Report, R.84-23 at PageID 725. Creger disputes that point, admitting only that he had been made aware of the civil order—as distinct from the conditions imposed on his bond—on June 3, one day after the open house incident. Regardless, though, Creger does not dispute that Evon's June 6 written statement indicated to Officer Tucker that *Evon*, who had "an order of protection in place" stating that "Dan Creger is not to contact or be near my (2) daughters or me," believed Creger knew about the civil order. June 6 Evon Creger Witness Statement, R.84-24 at PageID 728.

At the sheriff's office, a magistrate informed Officer Tucker that knowledge of an order of protection could serve as probable cause for aggravated stalking, a felony in Tennessee. Tucker then returned to the Smyrna Police Department to fill out three warrant affidavits for aggravated stalking in violation of Tennessee Code § 39-17-315(c) and one warrant affidavit for criminal contempt—for violating bail conditions—in violation of §§ 16-15-713 and 40-11-150. The probable cause testimony in each aggravated stalking affidavit—one for Evon, one for K.C., and one for A.C.—read, in its entirety:

> On 06/06/2019, I made contact with the victim, Evon Creger. She stated that her neighbors observed Daniel Creger at an open house several houses down from her own at 618 Easy Goer Way, on 06/02/2019. One of the witnesses was the Realtor at the home, and stated that the man in question identified himself as Dan Creger, he had two daughters, and was looking to move into the area. He also stated that he was going through a divorce. She stated that he told him [sic] that he saw the open house signs and wanted to come by. The witness told me that there were no open house signs directing anyone to the open house on the same road that Mr. Creger's soon to be ex wife was currently living in.

> The second witness, the husband of the first witness, was at their home (across the street from the victim's home), and noticed a dark colored Audi A8 parked at the open house. He had been made aware to be on the lookout for that specific car and Mr. Creger. He observed Mr. Creger get into the Audi, and then proceed down the street toward the victim's home. Mr. Creger then saw that the victim was outside, and immediately turned into a drive way just before her home, and turned around. He then sped off at a high rate of speed out of the neighborhood.
>
> Prior to this incident, Mr. Creger had not been made aware of the victim's home address. The victim did not want him to know her address. Mr. Creger found her address, and then proceeded to go to her neighborhood, street, and attempted to drive past her home all while being well aware that there was an Ex Parte Order issued commanding him to stay away from the victim. The two daughters shared between the suspect and victim, [K.C.] (13) and [A.C.] (11) were at the home at the time of the offense, and are listed in the Ex Parte Order.

June 6 Aggravated Stalking Affs., R.84-27, PageID 745, 747, 749 (first paragraph break added for legibility). The probable cause testimony in the criminal contempt affidavit read, in its entirety:

> Daniel Creger with active bond conditions for stalking and harassment against his wife, Evon Creger (victim), uncovered the victim's new address on Easy Goer Way, and went to an open house several houses down from the victim's home, and then attempted to drive past her home until he discovered that Mrs. Creger was outside of her home with one of their daughters showing the teenager how to use the garage door code, as witnessed by a neighbor who wrote a sworn statement. The active bond conditions state that the suspect is to stay away from the home of the victim or any location where the victim is likely to be.

June 6 Criminal Contempt Aff., R.84-28 at PageID 751. A judicial commissioner signed the four warrants, authorizing Creger's arrest. Creger turned himself in on June 10, 2019.

The four charges that resulted from Officer Tucker's June 6 affidavits form the basis for Creger's second § 1983 claim of malicious prosecution.

## D.      Outcome of Criminal Charges

After turning himself in for each of the above charges, Creger served a mandatory twelve-hour "hold," which is a required period of incarceration under Tennessee's stalking laws that defendants must serve before being permitted to post bond. *See* Tenn. Code Ann. § 40-11-150(h)(1). Creger served his twelve-hour hold for the first stalking charge when he turned himself

in on May 24. He again served a twelve-hour hold when he turned himself in on June 10 for the aggravated stalking charge.

On August 7, 2019, Creger entered into an agreement with the Rutherford County District Attorney General's Office to dismiss his May 22 stalking charge. Prosecutors further agreed to retire Creger's stalking offenses after six months contingent on him satisfying certain conditions. On February 5, 2020, a Smyrna court dismissed the stalking charges because Creger met the conditions for retirement. At that hearing, the court signed an order retiring the criminal contempt charge for thirty days. On March 16, 2020, a Smyrna court expunged all of Creger's criminal charges from May 22 and June 6, 2019.

**E.      Procedural History**

On February 4, 2021, Daniel Creger, first filing under a pseudonym, sued Officer Andrew Tucker and the Town of Smyrna under 42 U.S.C. § 1983 for two counts of malicious prosecution in violation of Creger's Fourth Amendment rights. After the district court denied his motion to proceed with litigation under a pseudonym, Creger filed an amended complaint in his own name on September 13, 2021. Creger alleged that Officer Tucker filed false charges on both May 22 and June 6 that resulted in Creger's arrest without probable cause. Creger further alleged that the Town's policies, training, supervision, and disciplinary practices "created an environment of reckless disregard for the risk" that officers in the Smyrna Police Department would falsely file criminal charges authorizing arrests without probable cause. Smyrna and Officer Tucker both answered the amended complaint on September 27, 2021.

The case proceeded for more than a year through discovery before Officer Tucker and the Town filed motions for summary judgment on October 21, 2022. Officer Tucker raised a qualified-immunity defense. The district court denied the defendants' motions for summary judgment. In its order, the district court declined to make any findings of law or fact, noting instead that the parties had failed to include concise statements of material facts that supported their arguments for and

against summary judgment. The court declined to find Officer Tucker and Smyrna were not clearly entitled to judgment as a matter of law, instead resting its denial solely on the parties' failure to show which undisputed material facts entitled them to judgment. Although the court acknowledged that denying qualified immunity could be seen as a "boon" to Creger's claims, the court also indicated that Creger could find himself "with a short-lived and pyrrhic victory" wherein his case could "evaporate with the granting of a motion for judgment as a matter of law at the close of his case-in-chief." Order Den. Summ. J., R.98 at PageID 1465–66. Both Officer Tucker and the Town of Smyrna timely appealed the court's denial of summary judgment.

## II.     JURISDICTION

We may exercise appellate jurisdiction over both Officer Tucker's and Smyrna's appeals. We have jurisdiction over the district court's denial of qualified immunity to Officer Tucker because, where we assume the plaintiff's version of any disputed facts and such disputes are not crucial to the defendants' appeal, the district court's denial of qualified immunity constitutes a collateral order immediately appealable under 28 U.S.C. § 1291. *See Coffey v. Carroll*, 933 F.3d 577, 583 (6th Cir. 2019); *Thompson v. Grida*, 656 F.3d 365, 367 (6th Cir. 2011); *Mitchell*, 472 U.S. at 530; *Gillispie v. Miami Township*, 18 F.4th 909, 916–17 (6th Cir. 2021).

As a general matter, we have jurisdiction to hear interlocutory appeals where the district court has denied a defendant government official's assertion of qualified immunity. *See Coffey*, 933 F.3d at 583; *Mitchell*, 472 U.S. at 527. However, we must be careful to exercise jurisdiction only over the appeal of questions of law, rather than questions of fact. At this "intermediate step," we lack jurisdiction to decide any genuine disagreements about material facts. *Coffey*, 933 F.3d at 583. Of course, this appeal is before us without the benefit of a factual recitation from the district court, leaving this panel to assess whether genuine disputes of fact preclude summary judgment.

On appeal, the parties admittedly dispute certain facts relating to information that Officer Tucker knew—or should have known—at the time he filed his arrest warrant affidavits. For

16

instance, Creger disputes exactly what his daughters told Officer Tucker during their interview, the level of distress Evon exhibited when she spoke to Officer Tucker, and whether Tucker misstated facts when he alleged in the harassment affidavit that Evon told Creger to cease direct contact. Creger further disputes that he had knowledge of the civil order of protection, which Officer Tucker indicated in the second set of affidavits, and he disputes that Officer Tucker had reason to believe Creger had found Evon's address.

Regardless of these minor factual disputes, we may exercise jurisdiction here because we accept the plaintiff's characterization of any disputed facts. *Sheets v. Mullins*, 287 F.3d 581, 585 (6th Cir. 2002); *see also Coffey*, 933 F.3d at 583–84. That leaves us to decide only a series of "strictly legal questions." *Coffey*, 933 F.3d at 583 (quoting *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002)). In this case, those questions are: Do the facts, as Creger alleges them, make out a violation of Creger's right against malicious prosecution? Specifically, do Creger's malicious-prosecution claims fail because no reasonable jury could find that Officer Tucker lacked probable cause when he swore warrant affidavits for Creger's two arrests? Relatedly, has Creger shown that Officer Tucker deliberately or recklessly mischaracterized any facts that Tucker included in his affidavits, resulting in Creger's arrest and prosecution without probable cause? *See Newman v. Township of Hamburg*, 773 F.3d 769, 771–72 (6th Cir. 2014). We may properly assess these legal questions in an interlocutory appeal.

Further, as explained below, Creger has failed to show that Officer Tucker violated Creger's constitutional rights, so we may also exercise pendent jurisdiction over Creger's § 1983 claim against the Town. *See Shumate v. City of Adrian*, 44 F.4th 427, 450 (6th Cir. 2022) ("Although not appealable as a final decision under 28 U.S.C. § 1291, an appellate court can exercise pendent appellate jurisdiction on a § 1983 claim alleging municipal liability where the municipality's motion for summary judgment is inextricably intertwined with the qualified immunity analysis properly before the Court." (quoting *Lane v. City of LaFollette*, 490 F.3d 410, 423 (6th Cir. 2007))); *Mattox v. City of Forest Park*, 183 F.3d 515, 523–24 (6th Cir. 1999) ("If the

plaintiffs have failed to state a claim for violation of a constitutional right at all, then the [municipality] cannot be held liable for violating that right any more than the individual defendants can."). Finding that Officer Tucker did not violate Creger's constitutional rights necessarily resolves Creger's claim against Smyrna, *see Shumate*, 44 F.4th at 450, because the existence of a constitutional violation is necessary to a municipal-liability claim under § 1983, *see Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 692 (1978); *Lane*, 490 F.3d at 423. Because we determine below that Creger did not commit a constitutional violation, we may exercise pendent jurisdiction over Creger's municipal-liability claim against Smyrna.

### III.     ANALYSIS

#### A.     Standard of Review

Summary judgment must be granted where there is no genuine dispute of material fact and the party moving is entitled to judgment as a matter of law. *Newman*, 773 F.3d at 771 (citing Fed. R. Civ. P. 56(a)). We review de novo a district court's rejection of a defendant officer's qualified-immunity defense at the summary judgment stage. *Coffey*, 933 F.3d at 584. The application of qualified immunity is a question of law. *Nelson v. City of Madison Heights*, 845 F.3d 695, 699 (6th Cir. 2017). Other than in cases where the plaintiff's characterization of facts blatantly contradicts the record such that the characterization is "demonstrably false," we may not resolve on an interlocutory appeal any genuine disagreements about the facts. *Coffey*, 933 F.3d at 583 (quoting *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015)); *see Scott v. Harris*, 550 U.S. 372, 380 (2007). So, we construe all evidence in the light most favorable to the plaintiff. *Coffey*, 933 F.3d at 584. To find the defendants were entitled to summary judgment, we must determine that no reasonable juror could believe that Officer Tucker's affidavits lacked probable cause. *See Peet v. City of Detroit*, 502 F.3d 557, 563 (6th Cir. 2007).

Qualified immunity protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Mitchell*, 472 U.S. at 517. The qualified-immunity defense balances competing values: On the one hand, a damages remedy is necessary for vindicating individuals' constitutional rights in the face of official abuses. On the other hand, qualified immunity reduces the social costs inherent in subjecting public officials to increased litigation, including expenses inherent to litigation, the diversion of officials' attention from public issues, and the deterrent effect the prospect of litigation might have on "able citizens" who would otherwise seek public office. *Harlow*, 457 U.S. at 813–14. Because qualified immunity is an "immunity from suit," officer defendants possess an entitlement not to stand trial or face other litigation burdens—an entitlement that is lost where a case erroneously goes to trial. *Mitchell*, 472 U.S. at 526 (emphasis omitted). For this reason, we require that courts address a defendant's qualified-immunity defense "early in the proceeding." *Coffey*, 933 F.3d at 584.

We review two questions on the appeal of a denial of qualified immunity: (1) whether the facts, as alleged, "make out a violation of a constitutional right," and (2) whether the right at issue was "clearly established" when the alleged violation occurred "such that a reasonable officer would have known that his conduct violated it." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). We may answer these questions in any order, and both must be answered in the affirmative for the litigation to continue to trial. *Id.* If the officer can prevail on either, he must be granted qualified immunity. *Coffey*, 933 F.3d at 584. Should the officer prevail on one question, we may decline to answer the other. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

**B.     Officer Tucker Is Entitled to Summary Judgment on Creger's Malicious-Prosecution Claims.**

The Sixth Circuit recognizes a constitutional claim—grounded in the Fourth Amendment—against government officials whose "deliberate or reckless falsehoods result in arrest and prosecution without probable cause." *See Newman*, 773 F.3d at 772; *see also Sykes v.*

*Anderson*, 625 F.3d 294, 312 (6th Cir. 2010); *Coffey*, 933 F.3d 577 at 591. This claim is traditionally called a "malicious prosecution" claim, although it is perhaps better described as an "unreasonable prosecutorial seizure," as "malice is not an element of a § 1983 suit for malicious prosecution." *Sykes*, 625 F.3d at 310 (quoting *Frantz v. Village of Bradford*, 245 F.3d 869, 881 (6th Cir. 2001) (Gilman, J., dissenting)).

For his malicious-prosecution claims to overcome a qualified-immunity defense at the summary judgment stage, Creger must at least show a genuine dispute over whether Officer Tucker committed a constitutional violation. That entails showing a genuine dispute over (1) whether Officer Tucker made, influenced, or somehow participated in the decision to prosecute; (2) whether the criminal prosecution lacked probable cause; (3) whether the prosecution deprived Creger of liberty, independent of the deprivation inherent in the initial seizure; and (4) whether the criminal proceeding has been resolved in Creger's favor. *See Coffey*, 933 F.3d at 590; *Sykes*, 625 F.3d at 308–09. Arguably, Creger succeeds on three of these elements. But the remaining element—the probable-cause requirement—is his downfall.

First, Creger has likely shown that a jury could find Officer Tucker influenced or participated in the decision to prosecute Creger for both sets of criminal charges. Our precedent tends to consider this factor in relation to the probable cause element: in the past, we have considered whether the plaintiff has sufficiently alleged facts leading to a "reasonable inference that either of the defendant officers 'influenced or participated' in the prosecutor's decision to continue the prosecution after he or she had knowledge of facts that would have led any reasonable officer to conclude that probable cause" did not exist. *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015). If we assume—only for the purpose of determining this first element—that Officer Tucker deliberately or recklessly acted without probable cause, then our precedent clearly establishes that the "influencing" element is satisfied where an officer knowingly or recklessly makes false statements to a judge or prosecutor that result in a warrant or prosecution. *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003); *Sykes*, 625 F.3d at 314–15; *Manuel v. City of Joliet*, 580

U.S. 357, 367 (2017) (describing how pretrial detention can violate the Fourth Amendment when "a judge's probable-cause determination is predicated solely on a police officer's false statements"); *see also Newman*, 773 F.3d at 772 (assuming the plaintiff needed to show an officer deliberately or recklessly mischaracterized a witness statement in a warrant affidavit before finding the officer had not in fact done so). Assuming the affidavits contained false or misleading statements, the undisputed fact that Officer Tucker swore the affidavits and submitted them to a judicial commissioner satisfies the first malicious-prosecution element.

Second, the parties do not dispute on appeal that Creger has shown a jury could find he suffered an independent deprivation of liberty. The "two sets of criminal charges each inflicted arrest, incarceration, and pretrial bond conditions." Creger I Appellee's Br. 53. The incarceration and pretrial bond conditions, at least, constitute deprivations of liberty under this Court's and the Supreme Court's Fourth Amendment jurisprudence. *See Coffey*, 933 F.3d at 590; *Sykes*, 625 F.3d at 308–09 (citing *Johnson v. Knorr*, 477 F.3d 75, 81 (3d Cir. 2007)); *Manuel*, 580 U.S. at 366.

Third, the parties similarly do not dispute on appeal that Creger has shown a jury could find the criminal proceeding has been resolved in his favor, at least under the standard that currently governs malicious-prosecution claims. Creger was not convicted of any of the charges filed. All that Creger must show, per the Supreme Court, is that his criminal prosecution ended without a conviction. *Thompson v. Clark*, 596 U.S. 36, 49 (2022). And the *Thompson* rule did not need to be "clearly established" at the time of the dispute for its rule to apply because the favorable-termination element serves no independent deterrent effect on police officers' conduct. *See Caskey v. Fenton*, No. 22-3100, 2022 WL 16964963, at *10–11 (6th Cir. Nov. 16, 2022); *see also Coello v. DiLeo*, 43 F.4th 346, 354 (3d Cir. 2022); *Smith v. City of Chicago*, No. 19-2725, 2022 WL 2752603, at *1 (7th Cir. July 14, 2022). Officer Tucker's involvement had ceased by the time the charges were dismissed, so the standard that applies to the favorable-termination element could not have deterred his conduct. Creger has shown a reasonable jury could find his proceedings were favorably terminated.

That leaves the probable cause determination. No reasonable jury could find that Officer Tucker's statements in each warrant affidavit he filled out in support of the charges he filed against Creger lacked probable cause. To show that probable cause justified the warrant statements, Officer Tucker must show that the information he possessed when he submitted the affidavits constituted "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion," that the offenses had occurred. *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (quoting *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc)). Probable cause—a flexible standard—requires only that the officer show there existed a "probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* at 562–63 (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)). We generally find probable cause exists where officers have "reasonably trustworthy information" to indicate to a "prudent man" that the plaintiff "had committed or was committing an offense." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 279 (6th Cir. 2020) (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000)). Officers must consider the totality of circumstances known to them and may not rely only on evidence of guilt while ignoring evidence of innocence. *Id.*

Importantly, for probable-cause determinations, the Sixth Circuit has recognized that witness statements to police are "generally sufficient to establish probable cause without further corroboration" because witnesses face significant legal consequences for lying to police officers— consequences that "tend to ensure reliability." *Lester v. Roberts*, 986 F.3d 599, 609 (6th Cir. 2021) (quoting *United States v. Hodge*, 714 F.3d 380, 385 (6th Cir. 2013)). We caveat, though, that uncorroborated statements might not suffice where there is an "apparent reason" to believe the witness was lying or had not accurately described the event in question. *Id.* (quoting *United States v. Harness*, 453 F.3d 752, 754 (6th Cir. 2006)); *Peet*, 502 F.3d at 564.

In *Lester*, multiple other witnesses corroborated the lead witness's implication of a criminal defendant and her photo array testimony identifying him as an accomplice to a murder. 986 F.3d at 610. And in *Peet*, the witness statement—about the identity of two men committing a robbery—

sufficed to support probable cause because the witness's reliability was supported by the sole fact that the witness knew a robber's pager number, which he had given to her in a restaurant before committing the robbery. 502 F.3d at 564. By these standards, no reasonable jury could have found that the statements that Officer Creger made in the six warrants here lacked probable cause. Further, because no constitutional violation occurred, we decline to answer whether Creger's right against malicious prosecution in this context was clearly established.

> **1.      Because Officer Tucker Had Probable Cause for the May 22, 2019, Warrant Affidavits, He Did Not Violate Creger's Constitutional Rights.**

Creger argues that certain factual disputes preclude finding that Officer Tucker possessed probable cause to write and submit harassment and stalking affidavits on May 22. Even construing these disputes in his favor, though, Creger cannot show that Officer Tucker lacked probable cause to submit either the stalking or harassment affidavit to a Smyrna judicial commissioner.

Under Tennessee law, harassment occurs where a person (1) intentionally communicates (2) with another person (3) without lawful purpose (4) with the intent that the communication annoy, offend, alarm, or frighten the recipient, and (5) the communication actually annoys, offends, alarms, or frightens the recipient. Tenn. Code Ann. § 39-17-308(a)(2). Creger claims Officer Tucker had no probable cause to make the assertion in the harassment affidavit that Evon had told Creger to "cease direct contact" when she saw his car across the intersection at 3:30 PM on May 22. May 22 Harassment Aff., R.84-7 at PageID 654. Creger further argues Officer Tucker ignored exculpatory evidence: that Creger had a lawful purpose for contacting Evon, which Creger himself characterizes as "complaining about being deprived of his parenting time." Creger I Appellee's Br. 45.

Given the evidence available to Officer Tucker—which, even taking Creger's view of the facts, included (1) Evon's phone call to Smyrna Police Dispatch, (2) direct evidence of the text messages that Evon and Creger exchanged on May 22, (3) a conversation that Office Tucker had with Evon and her daughters (ignoring the content of that conversation), (4) Evon's written witness

statement, and (5) a phone conversation between Creger and Officer Tucker—he clearly had probable cause to warrant his belief that harassment had occurred. Evon told dispatch that Creger had been following her car in a "threatening" manner. Dispatch Recording at 00:35–01:05. She further indicated that the cadence of his text messages was "eerie" and that she had avoided giving Creger her current address. *Id.* at 03:15–03:40; 04:50–05:06. Then, both parties admit, Evon showed Officer Tucker her texts with Creger. Tucker, in his affidavit, included verbatim the three texts that formed the basis for the harassment charge, accurately described the fact that the two were going through a divorce, and correctly indicated that Evon had not yet told Creger her new home address.

Perhaps the most important corroboration of Evon's statements, though, comes from Creger. In his phone call with Officer Tucker, Creger *never denies* Evon's claim that he had been following her. Creger also confirms that he had asked Evon for her address, arguing that he had a right to know it because his daughters were living with Evon. This call provides more than sufficient support for Officer Tucker's determination that Evon's witness statement was trustworthy, especially considering that we already give firsthand observations an independent presumption of reliability. *See Peet*, 502 F.3d at 564. Evon informed dispatch that she construed Creger's actions as threatening, showed Officer Tucker a text that told Creger to contact her attorney, and called his texting habits eerie—even before Officer Tucker confirmed with Creger that Creger had actually followed Evon in his car. Nothing in the harassment warrant affidavit misrepresents these basic facts—including Officer Tucker's reasonable inference that Evon's text telling Creger to contact her attorney constituted a request to stop contacting her. Indeed, the fact that Officer Tucker included the relevant texts verbatim in the warrant buttresses the conclusion that Tucker's statements were not misleading to the judicial commissioner. Inferring that Evon asked Creger to cease contact is not a misleading interpretation of a statement telling another person to contact an attorney. Further, including the text message in the affidavit emphasizes the fact that the statement *was* an inference—not a misleading statement of material fact. Finally, by

including Creger's text claiming that Evon was keeping him from their daughters, Officer Tucker indicated that he had considered whether Creger had a "lawful purpose" for contacting Evon—and that "complaining" (in Creger's words) did not suffice.

Similar analysis applies to Officer Tucker's May 22 stalking affidavit. Tennessee's stalking provision criminalizes any "willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim" to feel any of those emotions. Tenn. Code Ann. § 39-17-315(a)(4). A course of conduct, under the stalking provision, means a "pattern of conduct composed of a series of two (2) or more separate, noncontinuous acts evidencing a continuity of purpose." *Id.* § 315(a)(1). And harassment means any conduct "directed toward a victim" that includes—but is not limited to—"repeated or continuing unconsented contact that would cause a reasonable person to suffer emotional distress" and that actually causes such distress. *Id.* § 315(a)(3). Harassment excludes "constitutionally protected activity or conduct that serves a legitimate purpose." *Id.*

As above, the multiple pieces of evidence available to Officer Tucker before he submitted the stalking affidavit provide sufficiently trustworthy information that Creger had engaged in a course of conduct (texting multiple times and then following Evon in her car) that evidenced a continuity of purpose (obtaining Evon's and their daughters' address), would cause a reasonable person to suffer emotional distress (given Evon's description of Creger's "history" of domestic violence), and actually caused emotional distress (indicated by Evon's description of Creger's conduct as "threatening" and his failure to text her as "eerie").

Creger characterizes the events of May 22 as a single, continuous incident of five to ten minutes in which Creger followed Evon's car and sent her the text "No deal!" followed by a complaint about not seeing his daughters and a threat that "the judge" would not like her actions. Creger I Appellee's Br. 40. He argues that Officer Tucker lacked probable cause to assert that this conduct constituted a "course of conduct" under Tennessee's stalking prohibition. Creger fails to

acknowledge that the warrant affidavit itself describes Creger's 11:44 AM text asking for Evon's address, Creger's 2:24 PM text saying her address was "easy to find… I'm entitled to know where my [daughters] are sleeping," and *then* Creger's pursuit of Evon's car at roughly 3:30 PM and the set of three texts he sent thereafter. May 22 Stalking Aff., R.84-8 at PageID 655. On appeal, Creger argues that a "single continuous incident of some 5–10 minutes in duration" cannot constitute a course of conduct under Tennessee law. Creger I Appellee's Br. 40. Creger relies on *State v. Vigil*, 65 S.W.3d 26 (Tenn. Crim. App. 2001), for the proposition that two acts on the same day cannot constitute two separate occasions of harassment, as is required by the stalking statute.

But Creger's reliance on *Vigil* is misplaced. Beyond the error Creger makes in assuming Officer Tucker needed sufficient evidence to sustain a conviction—the relevant standard in *Vigil*—the case's facts are readily distinguishable. There, the Tennessee Court of Criminal Appeals found that driving past a building, circling the block, and immediately driving past the same building could not constitute a "separate" set of occasions under the stalking statue. *Vigil*, 65 S.W.3d at 34. Here, each of Creger's discrete acts—texting his wife in the late morning, texting again in the mid-afternoon, and then later following his wife's car—is separated by roughly an hour (or more) of non-contact. The acts Officer Tucker cited in the stalking affidavit were not only "5–10 minutes" of "continuous" conduct—the texts occurred over multiple hours, and following Evon's car constitutes a fundamentally different form of conduct than texting. At the very least, Officer Tucker had sufficient trustworthy information to suggest at the investigatory stage that Creger had engaged in a course of conduct aimed at obtaining Evon's home address. Of course, at this stage, we need not decide whether Creger did in fact commit stalking. We only need to decide if there was enough for Officer Tucker to have probable cause to issue the arrest warrant. This standard makes all the difference here.

Creger additionally challenges Officer Tucker's assertion that Evon suffered severe enough emotional distress to qualify under Tennessee's stalking provision. Creger points us to *State v. Flowers*, 512 S.W.3d 161 (Tenn. 2016), in which the Tennessee Supreme Court reversed a

conviction for stalking on evidence-sufficiency grounds because it found that the victim did not personally testify to feeling significant mental suffering or distress, as is required to establish that the victim actually felt such distress. 512 S.W.3d at 166. Indeed, although we note Evon told dispatch that Creger's driving was "threatening" and that his texting habits were "eerie," she never in her phone call or written statement uses words like "fear" or "distress." *See* Dispatch Recording; May 22 Evon Creger Witness Statement, R.84-4 at PageID 646–47. But this argument misses the mark. Creger again overlooks that we need not determine whether Creger *actually* committed the crime of stalking. We need only ask whether Officer Tucker knew of evidence that would lead a reasonable officer to *believe* Creger had committed the offense. *See Peet*, 502 F.3d at 563. Evon's direct testimony would be prima facie proof of her mental state. But we do not require prima facie proof to establish probable cause. *McClain*, 444 F.3d at 562–63.

*Peet* emphasizes the point. There, the witness's knowledge of an independent fact—in conjunction with the presumption of reliability we afford to eyewitness testimony made to police officers—sufficed to establish probable cause to rely on the witness's testimony. 502 F.3d at 564. Here, even without relying on the content of the interview Officer Tucker conducted with Evon and her daughters, Officer Tucker possessed sufficiently trustworthy evidence to establish probable cause that Evon was distressed. Evon's phone call to dispatch—which included her description of Creger's domestic abuse history, her statement that Creger's driving was threatening, and her description of his "eerie" set of texts—arguably suffices on its own. Add in that Evon drove directly to the police station, that she stated to Tucker that her attorney told her to pick up her daughters, and that Officer Tucker later independently verified the May 22 events with Creger (establishing Evon's reliability), and the sum is evidence that "amply established probable cause" for Creger's arrest and prosecution for stalking. *See Newman*, 773 F.3d at 772.

Because Officer Tucker had sufficient probable cause to make each statement in that warrant affidavits that he filed on May 22, Creger has failed to show any "constitutional violation

27

at all," and his malicious-prosecution claim must be dismissed. *See Pearson*, 555 U.S. at 236. Officer Tucker has qualified immunity against Creger's first malicious-prosecution claim.

> **2.** **Because Officer Tucker Had Probable Cause for the June 6, 2019, Warrant Affidavits, He Did Not Violate Creger's Constitutional Rights.**

In his second malicious-prosecution claim, Creger again argues that Officer Tucker lacked probable cause to write and submit one criminal contempt and three aggravated stalking affidavits on June 6, 2019. As above, though, even construing factual disputes in his favor, Creger cannot show that Officer Tucker lacked probable cause to submit any of the affidavits to a judicial commissioner.

In Tennessee, aggravated stalking (under the section Officer Tucker charged) occurs where a person commits stalking—the same offense Officer Tucker alleged on May 22—with the additional element that, at "the time of the offense," the defendant "was prohibited from making contact with the victim under a restraining order or injunction for protection, an order of protection, or any other court-imposed prohibition of conduct toward the victim," and the person "knowingly violates" the court order. Tenn. Code Ann. § 39-17-315(c)(1)(E). Creger claims Officer Tucker had no probable cause to assert in the aggravated stalking warrants that Creger found Evon's address and traveled to her house such that Creger's violation of his civil protection order or bond conditions was knowing under the aggravated stalking statute. Creger also argues, as he did for the May 22 stalking charge, that Officer Tucker lacked probable cause indicating Evon felt sufficient emotional distress.

Like on May 22, Officer Tucker possessed reasonably trustworthy information that Creger's presence on Easy Goer Way on June 2 sufficiently distressed Evon and her daughters under Tennessee's stalking statute to justify submitting aggravated stalking warrant affidavits on June 6. To start, Creger mistakenly argues that Officer Tucker was required to establish probable cause that Evon and her daughters were in reasonable fear of being assaulted and "suffering bodily injury or death." Creger I Appellee's Br. 51. Granted, the boilerplate language included in each

28

stalking affidavit (including the May 22 one) that Officer Tucker submitted includes that heightened fear requirement. But Officer Tucker filled in the probable cause section and modified the boilerplate language with sufficient information about Creger's court-imposed conditions to make clear that he alleged violations of section 315(c)(1)(E). Violation of the relevant section requires only that the suspect knowingly violated a court order prohibiting conduct toward a victim—which Tucker properly alleged in the aggravated stalking affidavits—and contains no heightened emotional distress requirement.

Creger again conflates the need to show probable cause that Evon and her daughters experienced emotional distress with the requirement to *prove* emotional distress to sustain a *conviction* for aggravated stalking. In Tennessee, lack of direct testimony explaining Evon's and her daughters' emotional states might, in a hypothetical criminal trial, be insufficient evidence for a conviction. *See Flowers*, 512 S.W. at 166. But at the preliminary stages of an investigation, where we require only reasonable grounds for belief, and *not* prima facie proof, *see McClain*, 444 F.3d at 562, the evidence available to Officer Tucker sufficed. Evon called Smyrna Police immediately after she found out Creger had been to her neighborhood. She and her daughters showed Officer Tucker the texts that K.C. had received from Creger—and those texts showed Tucker that K.C. had not responded. The first sentence Evon wrote in her witness statement indicated that she had an "order of protection in place." June 6 Evon Creger Witness Statement, R.84-24 at PageID 728. Officer Tucker knew—from his earlier investigation—that Evon and Creger were going through a divorce and that Evon had previously told him Creger had been arrested for domestic assault in Wisconsin while she was eight months pregnant. As with the May 22 stalking charge, this evidence more than satisfies our requirements to establish probable cause that Evon and her daughters were sufficiently distressed by Creger's conduct to justify filing aggravated stalking charges on June 6. *See Newman*, 773 F.3d at 772; *Peet*, 502 F.3d at 564.

Creger's strongest challenge to Officer Tucker's June 6 stalking affidavits is that Tucker lacked probable cause that Creger *knew* he was violating his civil order of protection. Creger

29

develops this argument in two ways: he first contends that Tucker had no reason to think Creger *actually knew* Evon and his daughters lived on Easy Goer Way. And Creger continues by claiming that Officer Tucker *should have known* that sufficient circumstantial evidence suggested Creger was in the neighborhood for an independent reason—to attend an open house. As described above, Creger contends his presence at the open house on the same street where his estranged wife and daughters lived was a coincidence. And, because of the factual posture of this appeal, we construe his assertions—that he left the neighborhood immediately upon seeing his daughter, that he had learned about the open house independently, that he believed the Smyrna Municipal Court judge had authorized him to text his daughters, and that he did not learn of the civil order of protection until June 3—in his favor. But again, the fact that the state may not have been able to *prove* Creger knew he had violated his order of protection beyond a reasonable doubt does not mean Officer Tucker lacked trustworthy information to support a *probable cause* determination. To the contrary, Tucker possessed more than enough information to suggest a substantial chance that Creger had violated Tennessee's aggravated stalking provision.

Consider the facts from Officer Tucker's perspective. Even crediting Creger's characterization of the events at issue in this appeal, by June 6, Officer Tucker knew that Evon had disclosed to the Smyrna Police Department a "history" of domestic abuse between the two partners. Officer Tucker knew that Evon Creger had obtained a civil order of protection on May 22. Further, on June 6, Officer Tucker knew Creger was aware of both his bond conditions and the civil protection order by June 3, which is when Creger showed up at the Smyrna Police Department to speak with Lieutenant Cutshaw about his criminal charges and the ex parte order. Beyond disputing Officer Tucker's intentions in signing the order and his knowledge about whether Creger's divorce attorney knew about the civil protection order, Creger certainly does not indicate he told anyone at Smyrna Police that he had just that day become aware of the civil order. Given the additional evidence Officer Tucker gathered on June 6, he had sufficiently reliable information that Creger knew about the civil protection order on or around June 2 (even if Creger didn't

30

*actually* know until June 3) to allege in the aggravated stalking warrants that Creger knowingly violated the order.

Creger does not dispute that on June 6, Officer Tucker gathered clear evidence that Creger had driven to an open house on Easy Goer Way on June 2. Creger readily admits that he did, in fact, drive to Easy Goer Way. Standing alone, considering his pending criminal charges, this coincidence arguably suffices to justify Officer Tucker's circumstantial inference that Creger had found Evon's address and attempted to stalk his wife and daughters. But we need not rest on this alone, because Officer Tucker gathered more evidence. Creger argues—based largely on later depositions—that Officer Tucker should have weighed exculpatory evidence that Creger saw signs in the neighborhood advertising the open house and legitimately sought to attend it. But the contemporaneous evidence Officer Tucker gathered—in particular, the witness statement from Lindsey Inghram—provided independent corroboration that Creger was illicitly stalking his family. According to Lindsey's recollection to Officer Tucker at the time, Creger showed "little interest" in the property. L. Inghram Witness Statement, R.84-24 at PageID 729. She specifically told Officer Tucker that she found his presence at the open house "odd" because, she stated, there were *not* public signs in the neighborhood about the open house. *Id.* She gave Officer Tucker additional reasons to think that Creger was not in the area legitimately: he had no real estate agent and no timeline to move in, indicating to Lindsey that he wasn't truly interested in purchasing a house. Further corroboration of suspicious behavior came from Lindsey's husband, who described how Creger drove toward Evon's house, "saw" his daughter, stopped to back up in a nearby driveway, and "hauled" back out of the neighborhood in the opposite direction. G. Inghram Witness Statement, R.84-24 at PageID 730. Standing alone, Grant's statement might suggest Creger did not intend to be near his wife and daughters. But, given all that Officer Tucker knew about Creger's contentious relationship, it might also reasonably suggest a desire merely to avoid being *seen* (and thus found out) by his wife and daughters. Given the totality of the circumstances that Officer Tucker knew by this point, the additional evidence he gathered from Lindsey and

31

Grant more than established probable cause to believe Creger had stalked his family in violation of court-imposed conditions.

Similarly, Officer Tucker had probable cause to believe Creger violated his bond conditions in violation of Tennessee's criminal contempt statute. *See* Tenn. Code Ann. § 40-11-150(i)(1) ("A person who violates a condition of release imposed pursuant to this section shall be subject to immediate arrest . . . ."). By June 6, Officer Tucker had evidence that Creger (1) knew before June 2 that his bond conditions required him to stay away from Evon and (2) had traveled to Easy Goer Way, the same street where Evon lived, while she and her daughters were present on their property. Although Creger challenges his actual knowledge of Evon's location—arguing that his violation was not "willful" under Tennessee law, *see Mawn v. Tarquinio*, No. M2019-00933, 2020 WL 1491368, at *3 (Tenn. Ct. App. 2020)—Creger *again* points us only to authority establishing that the state must prove the willful nature of his violation in order to sustain a *conviction*. At the probable-cause stage, these two facts constituted "reasonably trustworthy" evidence "sufficient" for Officer Tucker to conclude that Creger had committed criminal contempt. *See Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

Because Officer Tucker had probable cause to make each statement in the affidavits that he filed on June 6, Creger has made out no "constitutional violation at all," and his malicious-prosecution claim fails. *See Pearson*, 555 U.S. at 236. As a result, as with Creger's first claim, Officer Tucker has qualified immunity against Creger's second malicious-prosecution claim.

## C.      Because Officer Tucker Committed No Constitutional Violation, the Town of Smyrna Is Entitled to Summary Judgment.

Because Officer Tucker did not recklessly or deliberately file warrant affidavits that caused Creger's arrest without probable cause, we reverse the district court's denial of summary judgment for the Town of Smyrna. Creger's suit against Smyrna rests on the form of municipal liability for constitutional violations established in *Monell v. Department of Social Services of City of New*

*York*, which permits suits against municipalities that are, by virtue of an existing municipal "policy or custom," responsible for the constitutional violation inflicted by their employees or agents. 436 U.S. 658, 694 (1978). Smyrna correctly argues—and Creger does not dispute—that, where no constitutional violation to the victim has occurred, a claim for municipal liability cannot survive. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *White v. City of Detroit*, 38 F.4th 495, 500–01 (6th Cir. 2022). Because Creger did not suffer from a constitutional violation, we reverse the district court's denial of summary judgment to Smyrna under the doctrine of pendent jurisdiction. *See Mattox*, 183 F.3d at 523–24; *Shumate*, 44 F.4th at 450.

**D.** **Sanctions Are Not Warranted.**

Creger requests sanctions against Officer Tucker, the Town, and their counsel for pressing this appeal. We decline this request. Regardless of the outcome here, Officer Tucker was entitled to appeal a denial of qualified immunity on an interlocutory basis. *See Mitchell*, 472 U.S. at 524–25. And, because we have found Officer Tucker committed no constitutional violation, his and Smyrna's appeals are meritorious. Finally, *both* parties' litigation tactics before the district court have unnecessarily protracted this litigation. As such, sanctions against Officer Tucker are unwarranted.

## IV.    CONCLUSION

We **REVERSE** the district court's denial of the defendants' motions for summary judgment on the plaintiff's malicious-prosecution claims and **REMAND** for entry of an order dismissing the claims against defendants Andrew Tucker and the Town of Smyrna.